C. Griffith Towle (CA SBN 146401)
gtowle@bartkopavia.com
Bartko Pavia LLP
1100 Sansome Street
San Francisco, CA 94111
Tel.: (415) 956-1900

Thomas G. Pasternak (*pro hac vice pending*)
tpasternak@taftlaw.com
Benjamin S. Morrell (*pro hac vice pending*)
bmorrell@taftlaw.com
111 E. Wacker Dr., Ste. 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011

*Attorneys for Defendants Curtis H. Breville and Breville Enterprises LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BYTE BRIDGE, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>CURTIS H. BREVILLE, an individual; C.H. BREVILLE ENTERPRISES LLC, a Colorado limited liability company, dba IPE SOLUTIONS; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 3:26-cv-08627-WHO<br><br>**RESPONSE AND MEMORANDUM AND POINTS OF AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(FILED UNDER SEAL)**<br><br>Date: October 14, 2026<br>Time: 2:00 PM<br>Place: Videoconference |

## TABLE OF CONTENTS


INTRODUCTION ..... 1

STATEMENT OF RELEVANT FACTS ..... 2

I. Factual background ..... 2

A. Dr. Breville's expertise in liquid cooling and his employment with Byte Bridge ..... 2

B. Byte Bridge sends vague, unsupported demand letters to Dr. Breville and fails to engage with his timely responses ..... 6

II. Procedural history ..... 8

LEGAL STANDARD ..... 9

ARGUMENT ..... 9

I. Byte Bridge cannot meet its heavy burden to justify a preliminary injunction ..... 9

A. Only Counts I and II are at issue here ..... 9

B. Byte Bridge is unlikely to succeed on the merits of its trade secrets claims ..... 10

1. Byte Bridge publicly disclosed the FLCC Handout multiple times ..... 11

2. The information in the FLCC Handout was already public knowledge ..... 12

3. Byte Bridge fails to identify with sufficient particularity any other alleged trade secret ..... 14

4. Byte Bridge fails to show misappropriation ..... 15

C. Byte Bridge will not suffer irreparable harm absent a preliminary injunction ..... 17

1. Byte Bridge's lengthy delay defeats any claim of irreparable harm ..... 17

2. Byte Bridge has no evidence of any actual or threatened irreparable harm ..... 19

D. The balance of hardships does not tip in Byte Bridge's favor, and a preliminary injunction is not in the public interest ..... 21

II. Byte Bridge's overbroad request for expedited discovery should be denied ..... 23

CONCLUSION ..... 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adir Int'l, LLC v. Unicomer S.A. de C.V.*,
No. CV 07-01314 MMM (CTX), 2007 WL 10094750 (C.D. Cal. Nov. 19, 2007) .......... 18

*Am. LegalNet, Inc. v. Davis*,
673 F. Supp. 2d 1063 (C.D. Cal. 2009) .......... 23

*Apartment Ass'n of L.A. Cty., Inc. v. City of Los Angeles*,
10 F.4th 905 (9th Cir. 2021) .......... 9

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
678 F.3d 1314 (Fed. Cir. 2012) .......... 17

*Ass'n v. Bunner*,
116 Cal. App. 4th 241 (2004) .......... 12, 22

*Attia v. Google LLC*,
983 F.3d 420 (9th Cir. 2020) .......... 16

*Brian Lichtenberg, LLC v. Alex & Chloe, Inc.*,
No. CV 13-06837, 2013 WL 5775134 (C.D. Cal. Oct. 25, 2013) .......... 17

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
No. C 10-3428 PSG, 2013 WL 890126 (N.D. Cal. Jan. 23, 2013) .......... 22

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
174 F.3d 1036 (9th Cir. 1999) .......... 19

*Buffets, Inc. v. Klinke*,
73 F.3d 965 (9th Cir. 1996) .......... 12

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 17, 21

*Cisco Sys., Inc. v. Chung*,
462 F. Supp. 3d 1024 (N.D. Cal. 2020) .......... 14

*Citcon USA, LLC v. RiverPay Inc.*,
No. 20-16929, 2022 WL 287563 (9th Cir. Jan. 31, 2022) .......... 19

*Clements v. Alan Ritchey, Inc.*,
165 F. Supp. 2d 1068 (N.D. Cal. 2001) .......... 21

*Contender Partners, LLC v. Azteca Int'l Corp.*, No. 08-02026 MMM (JTLx), 2008 WL 11334492 (C.D. Cal. May 19, 2008) ................ 18

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198 (E.D. Cal. 2020)................................................................... *passim*

*Diversified Silicone Prods. Corp. v. Elastapro Silicone Sheeting LLC*, No. CV 20-2010 PSG (PJWx), 2020 WL 4390380 (C.D. Cal. May 19, 2020) .... 17, 18, 20

*Dutrisac v. STMicroelectronics, Inc.*, No. 23-CV-06639-BLF, 2024 WL 3646949 (N.D. Cal. Aug. 2, 2024)............................ 10

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ..................................................................................... 19

*Federated Indians of Graton Rancheria v. Haaland*, 762 F. Supp. 3d 888 (N.D. Cal. Jan. 10, 2025) ............................................................ 9, 21

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011)........................................................................... 19

*Harvest Small Bus. Fin. v. Mitnick*, No. 8:24-CV-00032-FWS-DFM, 2024 WL 694372 (C.D. Cal. Jan. 23, 2024)................ 15

*Hudson Martin Ferrante St. Witten & Demaria, PC v. Forsythe*, 2017 WL 550242 (N.D. Cal. Feb. 10, 2017)............................................................. 23, 24

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020)................................................................. 10, 11, 13, 14, 15

*Kunaknana v. U.S. Army Corps of Eng'rs*, No. 13-CV-00044-SLG, 2014 WL 975592 (D. Alaska Mar. 12, 2014) ........................... 18

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980)........................................................................... 21

*Luminate Home Loans, Inc. v. Better Mortg. Co.*, 2025 WL 437903 (S.D. Cal. Feb. 7, 2025) ............................................................ 19

*Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984)........................................................................... 17

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993)........................................................................... 10

*Moreland Apts. Assocs. v. LP Equity LLC*,
No. 19-cv-00744-EJD, 2019 WL 6771792 (N.D. Cal. Dec. 12, 2019) ............................ 11

*Nat'l Specialty Pharm, LLC v. Padhye*,
734 F. Supp. 3d 922 (N.D. Cal. 2024) ............................ 10

*New Dana Perfumes Corp. v. The Disney Store, Inc.*,
131 F. Supp. 2d 616 (M.D. Pa. 2001) ............................ 18

*Nextdoor.com, Inc. v. Abhyanker*,
No. C-12-5667 EMC, 2014 WL 1648473 (N.D. Cal. Apr. 23, 2014) ............................ 11

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) ............................ 17

*Open Text, S.A. v. Box, Inc.*,
36 F. Supp. 3d 885 (N.D. Cal. 2014) ............................ 22

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ............................ 11

*Twilio, Inc. v. Telesign Corp.*,
No. 16-CV-06925-LHK, 2017 WL 1208588 (N.D. Cal. Mar. 31, 2017) ............................ 10

*United States v. George*,
291 F. App'x 803 (9th Cir. 2008) ............................ 10

*V'Guara Inc. v. Dec*,
925 F. Supp. 2d 1120 (D. Nev. 2013) ............................ 20

*Valna Holding Cypress Ltd v. BiBo Biopharma Eng'g Co. Ltd.*,
No. 25-CV-03328-KAW, 2026 WL 594387 (N.D. Cal. Mar. 3, 2026) ............................ 23

*WeRide Corp. v. Kun Huang*,
379 F. Supp. 3d 834 (N.D. Cal. 2019) ............................ 12, 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................ 9, 22

*x.AI Corp. v. OpenAI, Inc.*,
821 F. Supp. 3d 1100 (N.D. Cal. 2026) ............................ 16, 17

*Zendar Inc. v. Hanks*,
No. 20-CV-03391-JSW , 2020 WL 4458903 (N.D. Cal. May 27, 2020) ............................ 19

**Statutes**

15 U.S.C.
§ 1051 ........................................ 8

18 U.S.C.
§ 1836 ........................................ 8
§ 1839(3) ........................................ 10, 11, 13
§ 1839(5) ........................................ 10, 15

California Statutes
Cal. Bus. & Prof. Code § 17200 ........................................ 8
Cal. Civ. Code § 2019.210 ........................................ 14
Cal. Civ. Code § 3426 ........................................ 8
Cal. Civ. Code § 3426.1(b) ........................................ 15
Cal. Civ. Code § 3426.1(d) ........................................ 11
Cal. Code Civ. Proc. § 18 ........................................ 11
Cal. Code Civ. Proc. § 3426.1(b) ........................................ 11

## INTRODUCTION

Plaintiff Byte Bridge's motion for a preliminary injunction amounts to an effort to monopolize public industry knowledge and impose, through trade secret law, a noncompete that California law would never enforce. Byte Bridge seeks to transform a 75-slide PowerPoint presentation into a trade secret, even though the "FLCC Handout" at issue contains only publicly available information about liquid cooling, including its history, industry trends, cooling methods, manufacturer names, and early adopters. That information is available from Wikipedia, manufacturer websites, professional associations, and the trade press. The Handout is not a proprietary formula, engineering specification, customer list, or nonpublic technical process. It does not qualify as a trade secret.

Byte Bridge then destroyed any possible claim of secrecy of this document by freely distributing printed copies to attendees at nine classes held in locations across the globe, without an NDA, confidentiality agreement, or enforced use restriction, and without collecting the handouts afterward. Byte Bridge publicly promoted its "FLCC program" as well, publishing the full course topic list, advertising a "World Tour," and inviting public enrollment. To the extent Byte Bridge derives any economic value from the FLCC Handout, it is from publicly disclosing it to attendees of these classes—not by keeping it secret.

Byte Bridge refuses to identify with particularity any alleged trade secret beyond the FLCC Handout, relying instead on vague references to "related materials" and "underlying materials," which does not satisfy the "reasonable particularity" requirement imposed by California and federal law. Nor is there evidence of misappropriation. Defendant Breville returned his company laptop at the end of his employment with Byte Bridge, possesses no Byte Bridge business information other than the FLCC Handout, and independently built Defendant IPE Solutions' certification program. IPE's self-paced video course with an animated instructor, university-style class structure, and tiered certifications is fundamentally different from the half day lecture and PowerPoint presentation Byte Bridge offered, and it is derived from public information Dr. Breville had gathered long before he took a job with Byte Bridge.

Byte Bridge also fails to satisfy the other required elements for a preliminary injunction. Its only evidence of irreparable harm is one declarant's speculation made on information and belief

about possible loss of customers and goodwill. Dr. Breville's sworn testimony contradicts this, and Byte Bridge's months-long delay after learning of Dr. Breville's plans further undercuts its argument. Finally, Byte Bridge's facially overbroad request for expedited discovery (seeking, among other things, to image all of Defendants' computers, storage devices, email accounts, and smartphones) should be denied, as the Court has already issued an evidence preservation order and Byte Bridge offers no evidence that Defendants have violated it.

For these reasons, discussed more fully below, Byte Bridge's motion should be denied.

## STATEMENT OF RELEVANT FACTS

### I. Factual background

#### A. Dr. Breville's expertise in liquid cooling and his employment with Byte Bridge

Dr. Curtis Breville is a data center liquid cooling specialist with more than 35 years in the information technology industry. He is recognized in the industry as a specialist in liquid cooling and regularly invited to speak on that subject at industry events. (Decl. of C. Breville ("Breville Decl.") ¶¶ 5–6; *see* **Ex. 1** (LinkedIn Profile).) Since March 2020, he has been the founder and CEO of Defendant C.H. Breville Enterprises LLC, doing business as IPE Solutions since January 2026. (*Id.* ¶¶ 3, 37.) IPE Solutions is a consulting company that offers, among other things, Certified Liquid Cooling Training focused on understanding, deploying, and operating liquid cooling in modern data centers. (*Id.* ¶ 37.)

Dr. Breville conceived the liquid cooling certification concept at issue here before he ever worked for Byte Bridge. In 2024, while employed by CoolIT Systems, he developed the view that a company could differentiate itself in the liquid cooling market by becoming the industry's "alma mater," and he began building that concept, including a training and certification program, while still at CoolIT. (*Id.* ¶ 8.) In the fall of 2024, Dr. Breville met with Byte Bridge's leadership at an industry event because Byte Bridge, an IT reseller and integrator, wanted to enter the liquid cooling space. (*Id.* ¶ 9.) In the weeks that followed, he discussed with Byte Bridge co-founder Marvin Cunanan the structured liquid cooling certification framework he had already begun developing at CoolIT. (*Id.* ¶ 10.)

Dr. Breville joined Byte Bridge in February 2025 and worked there for roughly 10 months,

ending as Vice President of Data Center Cooling Programs and GTM. (*Id.* ¶ 11.) His duties included developing the service portfolio, establishing partnerships, supporting the sales team as the technical expert on liquid cooling opportunities, and representing the company at conferences. (*Id.* ¶ 12.) He built out Byte Bridge's liquid cooling offerings and brought with him the training program he had created at CoolIT. (*Id.* ¶ 13.) Later, Mr. Cunanan told him that Byte Bridge did not want to be an educational institution and intended to use the training as a sales tool to get companies to hire Byte Bridge—an approach Dr. Breville did not agree with. (*Id.* ¶ 35.) Byte terminated his employment in December 2025. (*Id.* ¶ 36.)

The material Byte Bridge now calls its trade secret is a series of PowerPoint slides. Byte Bridge contends that the Foundational Liquid Cooling Certification ("FLCC") presentation materials are its trade secrets. (*Id.* ¶ 14; *see* Decl. of M. Cunanan ("Cunanan Decl."), ECF No. 6-2, ¶ 6.) That presentation consisted of approximately 75 slides (the "FLCC Handout"). (Breville Decl. ¶ 15, **Ex. 2** (FLCC Handout).[1]) Its subject matter is general, publicly available liquid cooling information, including [redacted]. (*Id.* ¶ 16.) It identifies third-party manufacturers and hyperscalers by name (among them [redacted]) along with early adopters such as [redacted], and it cites publicly reported figures, publicly available NVIDIA GB200 specifications, and industry market data. (*Id.* ¶ 17.)

None of that information originated with Byte Bridge. (*Id.* ¶ 18.) It is available from public sources including Wikipedia, manufacturer and OEM websites, the American Society of Heating, Refrigerating and Air-Conditioning Engineers, and the trade press. (*Id.* ¶¶ 18–19.) Dr. Breville's declaration and its **Exhibit 3** map examples of the specific content of the FLCC Handout—[redacted]

[1] Defendants filed under seal the FLCC Handout (and redacted related information from this brief and another exhibit) solely because Byte Bridge has designated it as confidential information. Defendants do not concede that the FLCC Handout contains confidential information or that the FLCC Handout or any information contained therein constitutes a trade secret.

[redacted]—to the public webpages where each topic appears. (*Id.* ¶ 20; **Ex. 3** (Comparison of FLCC Handout Slides with Publicly Available Information).) He created nothing new at Byte Bridge with respect to liquid cooling materials; everything in the FLCC Handout reflects what he knew long before he started there. (*Id.* ¶ 21.) Most of the slides contain few words, and much of what attendees learned came from what Dr. Breville presented orally. (*Id.* ¶ 23.)

Byte Bridge distributed the FLCC Handout freely and without any confidentiality restriction. Its own marketing department created a PDF version formatted with three slides per page and note-taking space, which Byte Bridge printed at a public retail location. (*Id.* ¶ 22.) Byte Bridge then handed out copies to every person who attended an FLCC class. (*Id.* ¶ 24.) Dr. Breville taught nine such classes—in Singapore, Dubai, Abu Dhabi, Austria, California, and St. Louis, Missouri—and the copy submitted with his declaration is dated November 15, 2025. (*Id.* ¶ 25.) The attendees were employees of other companies from around the world, including Siemens and Equinix, as well as independent mechanical engineers and data center operators. (*Id.* ¶ 26.) Dr. Breville was not asked to obtain, and did not obtain, any non-disclosure agreement, confidentiality agreement, or use restriction from any attendee; he did not instruct attendees to keep the handout or the presentation confidential; and to his knowledge no one else acting for Byte Bridge did so either. (*Id.* ¶ 33.) No one collected the handouts at the end of class (attendees kept them) and to Dr. Breville's knowledge, Byte Bridge imposed no restriction on what attendees could do with them. (*Id.* ¶ 34.) While some (but not all) slides appear to be marked "Proprietary and Confidential" in the bottom right corner, Byte Bridge did not act consistently with the label. (*Id.* ¶ 32.)

Byte Bridge also promoted the FLCC program to the public itself. On May 15, 2025, Byte Bridge published a blog post announcing the program's launch and launched a public FLCC webpage. (*Id.* ¶ 27; **Ex. 4** (Blog Post); *see also* Cunanan Decl. ¶ 7.) That page links to a second public FLCC webpage. (Breville Decl. ¶ 28; **Ex. 5** (Course Topic List).) Together, those pages published the full course topic list—tracking the same subjects covered in the FLCC Handout, from

[redacted]—promoted an "FLCC World Tour," and invited the public to enroll. (*Id.* ¶ 29.) Dr. Breville's name, biography, and photograph appeared on that public page. (*Id.*; *see also* Cunanan Decl. ¶ 7, ECF No. 6-2.) A frequently asked question told the public that the World Tour "brings FLCC sessions to key cities worldwide" and solicited requests to "bring the FLCC program to your city." (Breville Decl. ¶ 30; **Ex. 6** (FAQ).) And when Dr. Breville taught the October 6–7, 2025 class in Singapore, Byte Bridge posted about it on its public LinkedIn account, including photographs of Dr. Breville and the attendees. (Breville Decl. ¶ 31; **Ex. 7** (LinkedIn Post).)

After leaving Byte Bridge, Dr. Breville built a different product. In January 2026 he started IPE Solutions, which offers Certified Liquid Cooling Training. (Breville Decl. ¶ 37; **Ex. 8** (IPE Solutions Website).) That program is an online, self-paced video course taught by an animated cartoon character named "LC," organized in a university-style numbered structure of separate classes—Liquid Cooling 101 through Service & Support 400—with tiered Starter, Associate, and Professional designations. (Breville Decl. ¶¶ 38–40.) Dr. Breville created none of that at Byte Bridge, where no such class structure existed. (*Id.* ¶ 40.) The difference is one of kind, not degree: at Byte Bridge he showed up and delivered a half-day lecture from a PowerPoint deck. (*Id.* ¶ 38.) Some of the historical information overlaps because that history is publicly available. (*Id.*) Dr. Breville looks forward to showing the Court the current program by demonstration at the scheduled hearing on Byte Bridge's motion for a preliminary injunction. (*Id.* ¶ 41.)

Dr. Breville did not retain Byte Bridge's proprietary information. When he resigned, he returned the laptop Byte Bridge had issued to him. (*Id.* ¶ 58.) He does not possess Byte Bridge emails, documents, customer lists, pricing information, or business plans. (*Id.* ¶ 59.) The only Byte Bridge material he has is a PDF copy of the FLCC Handout—the same document Byte Bridge handed out to every class attendee—and he has offered to return or destroy it. (*Id.* ¶¶ 24, 60.)

Nor has Dr. Breville used anything of Byte Bridge's to take its business. He has not solicited any Byte Bridge client, customer, or employee since leaving, and he does not compete for Byte Bridge's reselling and integration business. (*Id.* ¶¶ 43–44.) His customers come to him because of his reputation; an attendee of the November 2025 St. Louis class, for instance, approached him at

a 2026 industry conference, not the reverse. (*Id.* ¶ 45.) Far from discouraging business with Byte Bridge, Dr. Breville told the audience at a March 12, 2026 AFCOM panel in Northern California (which included three members of Byte Bridge's sales team) that anyone looking for liquid cooling services should contact Byte Bridge. (*Id.* ¶¶ 46–47.) He has also sent emails and texts to steer end users to Byte Bridge with no financial gain to himself. (*Id.* ¶ 48.)

Finally, and months before Byte Bridge's first demand letter, Dr. Breville told Byte Bridge exactly what he was doing. He filed three trademark applications with the United States Patent and Trademark Office ("USPTO") in his own name, for "Foundational Liquid Cooling Certification," "Liquid Cooling Certification," and "FLCC." (*Id.* ¶ 56.) On February 16, 2026—within days of the last USPTO filing—he emailed Mr. Cunanan and Alisha Tominaga of Byte Bridge, in a message titled "Alignment on FLCC™ Branding and Usage," disclosing all three filings, explaining his ownership position, and proposing licensing and collaboration. (Breville Decl. ¶ 51; **Ex. 9** (C. Breville's Feb. 16, 2026 Email to Pl.).) Byte Bridge never substantively responded, and Dr. Breville heard nothing further until its counsel's first demand letter more than three months later. (Breville Decl. ¶¶ 53, 57.)

### B. Byte Bridge sends vague, unsupported demand letters to Dr. Breville and fails to engage with his timely responses.

On June 1, 2026, Byte Bridge's counsel sent Dr. Breville a demand letter accusing him of misappropriating Byte Bridge's trade secrets, infringing its copyrights and trademarks, and unlawfully soliciting its customers. (Pl.'s June 1, 2026 Ltr. to C. Breville, ECF No. 6-3 at 4–7.[2]) The letter made nine categories of demands—including that Dr. Breville certify within three days that he had destroyed all Byte Bridge "Proprietary Information," withdraw his pending trademark applications with prejudice, and pay $50,000 in damages plus $10,000 in attorney's fees—without identifying a single trade secret, copyrighted work, or customer at issue, or any basis for its damages figure. (*Id.*)

Dr. Breville responded by email the very next day, addressing Byte Bridge's allegations

---

[2] Because Byte Bridge filed Mr. Tseng's and Mr. Cunanan's declarations and all their respective exhibits under a single ECF number, Defendants cite these exhibits using the ECF pagination to identify all pages on which they appear.

point by point to clear up the "misunderstandings" in its letter. (Def.'s June 2, 2026 Email to Pl.'s Counsel, ECF No. 6-3 at 13–15.) He made clear that he had not retained, used, or disclosed any Byte Bridge confidential information, customer lists, pricing, or trade secrets, nor had he solicited any Byte Bridge customers. (*Id.*) Dr. Breville explained that (1) he conceived the FLCC concept, framework, and branding in 2024 while employed at CoolIT Systems, and had discussed those concepts with Marvin Cunanan and other Byte Bridge leadership in 2024, before joining Byte Bridge, (2) he independently developed the Liquid Cooling 101 self-paced course after his departure using publicly available sources and his own career expertise, and (3) had previously contacted Mr. Cunanan and Byte Bridge's human resources leadership in February 2026 to disclose his trademark filings, explain his ownership position, and propose licensing and collaboration. (*Id.*) Dr. Breville asked Byte Bridge to identify with specificity the trade secrets or confidential information allegedly retained, the copyrighted materials allegedly infringed, the trademark or ownership rights allegedly violated, the customers allegedly solicited, and the factual basis for its monetary demand—while stating that he remained willing to engage in a constructive dialogue to resolve any legitimate concerns. (*Id.*)

Byte Bridge waited 16 days to respond, doing so again by letter on June 18, and asserted that Dr. Breville's explanations were unavailing while supplying none of the specificity he had requested. (Pl.'s June 18, 2026 Ltr. to C. Breville, ECF No. 6-3 at 4, at 8–10.) Notably, the letter "categorically den[ied] . . . as false" Dr. Breville's statement that he had contacted Marvin Cunanan and ByteBridge HR in February 2026 to disclose and discuss his trademark filings. (*Id.*) The second letter renewed verbatim the same nine demands, including the same $50,000 and $10,000 payments, and set a June 22 deadline to confirm compliance—still without identifying any particular trade secret, copyrighted work, or solicited customer, or any calculation of its alleged damages. (*Id.*)

Dr. Breville responded by email four days later, noting that Byte Bridge had not supplied any of the details regarding its asserted claims that he had asked for, and providing copy of his February 16, 2026 email to Mr. Cunanan and Alisha Tominaga, titled "Alignment on FLCC™ Branding and Usage," which documented the very disclosure Byte Bridge had just "categorically" denied (his trademark filings, his ownership position, and his willingness to pursue licensing and

collaboration) months before any demand letter issued. (C. Breville's June 22, 2026 Email to Pl.'s Counsel, ECF No. 6-3 at 11–12.) Byte Bridge chose not to include this attachment in its filings with the Court. Defendants do so here. (Ex. 9.) Dr. Breville repeated his request that Byte Bridge provide with "particularity the alleged misconduct, proprietary information, damages, and legal basis supporting ByteBridge's claims" and stated that "[i]f ByteBridge wishes to engage in a constructive discussion supported by specific facts and evidence, I remain willing to do so." (C. Breville's June 22, 2026 Email to Pl.'s Counsel.)

Byte Bridge sent no further correspondence to Dr. Breville. (Breville Decl. ¶ 55.)

## II. Procedural history

Nearly two months later, on August 19, 2026, Byte Bridge filed suit in this Court asserting claims for trade secret misappropriation against all Defendants under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq*. (Counts I and II, respectively), false designation of origin under the Lanham Act, 15 U.S.C. § 1051 *et seq*., against all Defendants (Count III), breach of fiduciary duty and the duty of loyalty against Dr. Breville (Count IV), unfair competition under Cal. Bus. & Prof. Code § 17200 *et seq.*, against all Defendants (Count V), breach of contract against Dr. Breville (Count VI), intentional interference with contract and prospective economic relations against all Defendants (Count VII), and negligent interference with contract and prospective economic relations against all Defendants (Count VIII). (Compl., ECF No. 1.)

That same day, Byte Bridge filed an ex parte motion requesting a temporary restraining order ("TRO"), an order to show cause why the Court should not issue a preliminary injunction ordering the same relief requested in the motion for a TRO, and an order requiring Defendants to "retain and preserve all documents relating to this action" and prohibiting them "from destroying or modifying any such evidence." (Pl.'s Mot. for TRO, ECF No. 6, at 5.) Beyond that, Byte Bridge sought sweeping discovery-related relief requiring Defendants to return all "Misappropriated Proprietary Information" within three days, identify and produce (or allow forensic imaging of) every device, storage account, and medium containing such information, and turn over all login credentials and passwords necessary to access Dr. Breville's IPE Solutions email account, domain, and

related storage locations. (*Id.* at 3–5.) Byte Bridge also sought an order compelling Defendants to disclose all third parties or locations to which they had transmitted or stored any of Byte Bridge's proprietary information, alongside a broad evidence preservation order prohibiting the destruction or modification of any documents or electronic communications related to the action. (*Id.*)

The Court denied Byte Bridge's motion for a TRO, finding "that broad emergency relief is not warranted ex parte and that these issues are more appropriately resolved at the preliminary injunction stage." (Order Denying Mot. for TRO, ECF No. 14, at 1.) The Court issued an evidence preservation order (*id.* at 1), and later issued an order construing Byte Bridge's motion for a TRO as a motion for a preliminary injunction, setting a briefing schedule, and scheduling a hearing on the motion. (Civil Minutes, ECF No. 16.)

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (cleaned up). In order for the Court "to issue a preliminary injunction, the plaintiff must demonstrate that, at some level, all four factors are met." *Federated Indians of Graton Rancheria v. Haaland*, 762 F. Supp. 3d 888, 897 (N.D. Cal. Jan. 10, 2025). "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Apartment Ass'n of L.A. Cty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021) (cleaned up).

**ARGUMENT**

**I. Byte Bridge cannot meet its heavy burden to justify a preliminary injunction.**

**A. Only Counts I and II are at issue here.**

Byte Bridge asserts that its motion for a preliminary injunction encompasses its trade secrets claims, its Lanham Act claim, and its claim for breach of contract regarding two alleged agreements

between Byte Bridge and Dr. Breville. (Pl.'s Mot. at 1.) Byte Bridge's supporting brief, however, contains only arguments regarding the trade secrets claims. (*See generally* Pl.'s Br.) The other claims are briefly referenced as "related claims," with no actual argument as to the merits of those claims. To the extent Byte Bridge asserts the Court should grant a preliminary injunction based on the Lanham Act claim or the breach of contract claim, its "failure to adequately develop these arguments in [its] brief operates as a waiver."[3] *Twilio, Inc. v. Telesign Corp.*, No. 16-CV-06925-LHK, 2017 WL 1208588, at *20 (N.D. Cal. Mar. 31, 2017) (quoting *United States v. George*, 291 F. App'x 803, 805 (9th Cir. 2008)).

**B. Byte Bridge is unlikely to succeed on the merits of its trade secrets claims.**

Byte Bridge brings claims for trade secret misappropriation under both the federal DTSA and the California CUTSA. Courts analyze these claims together "because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). Byte Bridge must prove: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58 (citing 18 U.S.C. § 1839(5)). The definition of trade secret consists of three elements: "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *Id.* at 657 (citing 18 U.S.C. § 1839(3), (5)).

The plaintiff "must identify the trade secrets and carr[ies] the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). "The plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *InteliClear*, 978 F.3d at 658 (cleaned up). A plaintiff "may not simply rely upon catchall phrases or identify categories of trade secrets the plaintiff intends to pursue at trial," and "[l]ong lists of general areas of information containing unidentified trade secrets are not substitutes for particularized and concrete trade secrets." *Id.* (cleaned up); *Nat'l Specialty Pharm, LLC v. Padhye*,

[3] If Byte Bridge includes in its reply brief arguments related to these other claims, the Court should decline to consider them, as arguments raised "for the first time in a reply brief . . . [are] forfeited." *Dutrisac v. STMicroelectronics, Inc.*, No. 23-CV-06639-BLF, 2024 WL 3646949, at *12 n.3 (N.D. Cal. Aug. 2, 2024).

734 F. Supp. 3d. 922, 929 (N.D. Cal. 2024). A plaintiff must also show that the defendant misappropriated the trade secret by disclosing or using the trade secret without implied or express consent, or by acquiring it through improper means. *See* Cal. Code Civ. Proc. § 3426.1(b); 18 U.S.C. § 1839(5).

Byte Bridge fails to establish the FLCC Handout at issue qualifies as a trade secret. It was publicly disclosed multiple times, and the underlying information is already public. Further, Byte Bridge fails to show the Defendants misappropriated the FLCC Handout. To the extent Byte Bridge claims its trade secret claims are predicated on information other than the FLCC Handout, it has failed to identify such additional information with sufficient particularity.

**1. Byte Bridge publicly disclosed the FLCC Handout multiple times.**

Byte Bridge cannot establish secrecy after providing copies of its alleged trade secret to training attendees from outside companies without imposing confidentiality obligations. To qualify as a trade secret, the owner must "ha[ve] taken reasonable measures to keep such information secret." *InteliClear*, 978 F.3d at 660 (citing 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d)). "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984). Accordingly, courts have held that "[i]nformation that an individual discloses to others who are under no obligation to protect its confidentiality" does not qualify for trade secret protection. *Moreland Apts. Assocs. v. LP Equity LLC*, No. 19-cv-00744-EJD, 2019 WL 6771792, at *3 (N.D. Cal. Dec. 12, 2019) (quoting *Nextdoor.com, Inc. v. Abhyanker*, No. C-12-5667 EMC, 2014 WL 1648473, at *4 (N.D. Cal. Apr. 23, 2014)). "A disclosure need not be widespread to defeat trade secret protection; it is defeated if no reasonable effort was made to maintain secrecy." *Id.*

That is the case here. Byte Bridge widely distributed the FLCC Handout without creating any understanding of confidentiality. Copies were distributed indiscriminately to all presentation attendees from outside companies—on nine separate occasions—and the attendees were not required to return them after the presentation. (Breville Decl. ¶¶ 24, 25, 34.) Byte Bridge imposed no nondisclosure or confidentiality requirement on the attendees. (*Id.* ¶ 33.) Byte Bridge imposed no

restrictions on what attendees could do with the handouts they received. (*Id.* ¶ 34.) Whatever significance the "Proprietary and Confidential" footer might otherwise have had, Byte Bridge's conduct did not correspond to the label. It certainly does not show Byte Bridge employed "reasonable measures" to keep secret the FLCC Handout.

Byte Bridge also separately published the substance and organization of the FLCC curriculum. Its public webpage listed the course topics in detail, identified Dr. Breville as the presenter, invited public enrollment, and promoted a multi-city tour. (*Id.* ¶¶ 27–29; Exs. 4, 5.)) This demonstrates a marketing campaign intended to reach potential customers and course participants—not an accidental disclosure. While limited or obscure publication does not invariably destroy secrecy, the relevant inquiry is whether the information retained economic value because it was not generally known to persons who could derive economic benefit from it. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019) ("The fact that the alleged trade secrets are not generally known gives them value because plaintiff's competitive advantage would evaporate if the public or its competitors could easily recreate them." (cleaned up)).

To the extent Byte Bridge derived any economic value from the FLCC Handout, it did so *by explicitly disclosing that information to the public*: employees of other companies who sign up for and attend its training program. Such information definitionally cannot constitute a trade secret. *See Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) ("[W]hile it may have been reasonable to conclude that [a business] obtained value from the manuals, there is little to suggest that any value was obtained from the manuals being kept secret."); *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1205 (E.D. Cal. 2020) ("[T]rade secret . . . information 'is valuable because it is unknown to others' and 'the owner has attempted to keep [it] secret.'" (quoting *DVD Copy Ctrl. Ass'n v. Bunner*, 116 Cal. App. 4th 241, 251 (2004) (second alteration in original))). Byte Bridge therefore has not shown it employed reasonable measures to protect its alleged trade secret.

**2. The information in the FLCC Handout was already public knowledge.**

More fundamentally, the FLCC Handout is comprised of entirely public knowledge: [redacted]

[redacted]. (Breville Decl. ¶¶ 16–20; Ex. 3.) It does not identify any proprietary formula, engineering specification, customer information, or nonpublic technical process specific to Byte Bridge. All of the information encompassed in the FLCC Handout is generally known in the industry and publicly available online. *See InteliClear*, 978 F.3d at 658 (noting that a plaintiff "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade" (cleaned up)). Publicly available information cannot establish the "independent economic value" element of a trade secret because trade secret "information is valuable because it is unknown to others." *Cutera*, 444 F. Supp. 3d at 1205; *see* 18 U.S.C. § 1839(3).

Byte Bridge broadly asserts that its "FLCC program" and all "related" and "underlying" materials are trade secrets without making any attempt to parse between what is public information known in the industry and what is not. A cursory glance at the FLCC Handout shows that it contains entirely public information. Dr. Breville's declaration and Exhibit 3 thereto compare specific information present in exemplars of slides in the FLCC Handout with information that is publicly available on the internet. For example:

- Page 5, Slide 2: [redacted]
- Page 5, Slide 3: [redacted]
- Page 6, Slide 1: [redacted]
- Page 6, Slide 3 and Page 10, Slide 2: [redacted]
- Page 8, Slide 1: [redacted]

[redacted]

- Page 24, Slide 1: [redacted]

(Breville Decl. ¶ 20; Ex. 3.)

Although a compilation of information may sometimes qualify for protection even if its individual elements are generally known, a plaintiff still must define the asserted compilation with sufficient particularity to distinguish its boundaries from general industry knowledge and permit Defendants to investigate their defenses. *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1048 (N.D. Cal. 2020) ("[A]llegations that set out purported trade secrets in broad, categorical terms . . . are insufficient to state a claim."). Here, Byte Bridge treats the entire FLCC program, its name, the Handouts, unspecified "underlying files," customer identities, business plans, and marketing strategies as one undifferentiated secret. Its proposed order extends still further, covering anything "related to" confidential aspects of any file Dr. Breville allegedly obtained. That does not identify a specific combination that could create value from secrecy.

Nor does Byte Bridge establish that secrecy gave the Handouts independent economic value. Information without independent economic value does not support a misappropriation claim. As discussed above, Byte Bridge's evidence that customers paid for instruction may show that a live course had commercial value, but it does not show that the Handouts were valuable because their contents were secret—particularly where Byte Bridge distributed the Handouts without confidentiality restrictions. *See Cutera*, 444 F. Supp. 3d at 1205.

**3. Byte Bridge fails to identify with sufficient particularity any other alleged trade secret.**

California law requires that plaintiffs "identify their trade secrets with 'reasonable particularity' prior to commencing discovery," and "[f]ederal courts have applied the state provision in federal cases." *InteliClear*, 978 F.3d at 658 n.1 (quoting Cal. Civ. Code § 2019.210). To the extent Counts I and II are based on any alleged trade secret other than the FLCC Handout, Byte Bridge fails to satisfy this requirement.

The one substantive declaration filed in support of Byte Bridge's motion vaguely references

Byte Bridge's alleged "sensitive trade secrets related to Byte Bridge's industry technology and services," and states that its alleged "trade secrets specifically included the Foundational Liquid Cooling Certification ("FLCC") program and its related materials." (Cunanan Decl. ¶ 6.) The declaration also refers to "underlying materials" of the FLCC program and "related materials," but never specifies what these alleged "underlying" or "related" materials are. Nor does Byte Bridge identify with any particularly any alleged trade secret not related to the "FLCC program."

Byte Bridge thus fails to "clearly refer to tangible trade secret material" that supports its claims. *InteliClear*, 978 F.3d at 658 (cleaned up). The "underlying" and "related" materials labels are the exact sort of "catchall phrases" that courts have found insufficient. *Id.* (cleaned up). Similarly, the phrase "trade secrets related to Byte Bridge's industry technology and services" that appears once in Mr. Cunanan's declaration, (Cunan Decl. ¶ 6), is a vague "categor[y]" and not describe a specific trade secret. *InteliClear*, 978 F.3d at 658 (cleaned up). These vague, conclusory allegations "are not substitutes for particularized and concrete trade secrets." *Id.* (cleaned up); *see Harvest Small Bus. Fin. v. Mitnick*, No. 8:24-CV-00032-FWS-DFM, 2024 WL 694372, at *6 (C.D. Cal. Jan. 23, 2024) ("Plaintiffs fail to identify with particularity what servicing platform or training material documents are at issue, what in those documents constitutes a trade secret, or where within these documents that information is located. Thus, the court concludes Plaintiffs are unlikely to prevail on their trade secret claims regarding the servicing platform and training materials." (record citation omitted)).

The Court must therefore construe Byte Bridge's motion as limited to the FLCC Handout, as Byte Bridge has specified no other document or information that constitutes its alleged trade secret.

**4. Byte Bridge fails to show misappropriation.**

"Misappropriation" means acquisition of a trade secret through means that the party knew or should have known were improper, such as theft or breach of a duty to maintain secrecy. *WeRide* , 379 F. Supp. 3d at 846 (citing 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)). Byte Bridge has not shown Dr. Breville or his company engaged in any such act.

Before leaving Byte Bridge, Dr. Breville returned his company laptop. (Breville Decl. ¶ 58.)

He did not retain Byte Bridge business information. (*Id.* ¶¶ 59–60.) Everything in the FLCC Handout reflects what Dr. Breville knew about liquid cooling long before he ever started working at Byte Bridge, and some of the historical information is the same in both the FLCC Handout and Dr. Breville's current program because that history is publicly available. (*Id.* ¶¶ 21, 38.) Although he may possess a PDF copy of the FLCC Handout (which he has offered to return), mere possession does not justify an injunction—particularly where numerous other individuals also retained possession of the FLCC Handout after the presentation. *Cutera*, 444 F. Supp. 3d at 1207 ("Mere possession of trade secrets by a departing employee is not sufficient to establish misappropriation or show injury." (cleaned up)); *x.AI Corp. v. OpenAI, Inc.*, 821 F. Supp. 3d 1100, 1110 (N.D. Cal. 2026) (referring to "the well-established principle that mere possession of trade secrets is not sufficient to constitute misappropriation" (citation omitted and collecting cases). The course Dr. Breville developed and now markets is entirely different from the presentation associated with the FLCC Handout. (Breville Decl. ¶¶ 38–40.) Compared to the FLCC presentation associated with the FLCC Handouts, Dr. Breville's course uses different visual materials, an animated instructor, a self-guided structure, and certification tiers. (*Id.*) Similar treatment of public liquid-cooling history and concepts does not demonstrate copying of a secret.

Byte Bridge's misappropriation argument relies heavily on Dr. Breville's use of "FLCC" and on trademark applications listing dates during his Byte Bridge employment (and more generally, Byte Bridge's filings conflate trade secrets and trademark law throughout). Those allegations may concern disputed trademark ownership, but they do not establish the improper acquisition, disclosure, or use of confidential content requisite of a DTSA or CUTSA violation. *x.AI Corp.*, 821 F. Supp. 3d at 1107 ("The [DTSA] provides the following three definitions of misappropriation: (1) the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent." (quoting *Attia v. Google LLC*, 983 F.3d 420, 424 (9th Cir. 2020))). Byte Bridge identifies no imminent plan by

Defendants to publish, sell, or disclose the FLCC Handout itself.[4]

**C. Byte Bridge will not suffer irreparable harm absent a preliminary injunction.**

Byte Bridge bears the burden of showing that it is likely to imminently suffer an actual injury—not a speculative injury that is merely possible. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). In trade secret cases, a plaintiff seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm, even if it is likely to succeed on the merits. *Diversified Silicone Prods. Corp. v. Elastapro Silicone Sheeting LLC*, No. CV 20-2010 PSG (PJWx), 2020 WL 4390380, at *2 (C.D. Cal. May 19, 2020). As discussed herein, Byte Bridge cannot make either showing.

**1. Byte Bridge's lengthy delay defeats any claim of irreparable harm.**

"A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (reversing grant of preliminary injunction). Accordingly, "in analyzing irreparable harm, courts should take into account whether a movant 'proceeded as quickly as it could have' in seeking" injunctive relief. *Brian Lichtenberg, LLC v. Alex & Chloe, Inc.*, No. CV 13-06837, 2013 WL 5775134, at *4 (C.D. Cal. Oct. 25, 2013) (quoting *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (analyzing a preliminary injunction)).

Here, Byte Bridge's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Dr. Breville placed Byte Bridge on notice of his submission of trademark applications with the USPTO (for "Foundational Liquid Cooling Certification," "Liquid Cooling Certification," and "FLCC") and his broader plan to offer "training" on liquid cooling in February 2026, when he

[4] Byte Bridge's vicarious liability argument similarly fails. In applying the doctrine of *respondeat superior* "to alleged misappropriation of trade secrets intended to benefit a *future* employer, courts also require allegations that the future employer subsequently used the trade secrets or the wrongdoer used the trade secrets once he actually became employed." *x.AI Corp.*, 821 F. Supp. 3d at 1109 (cleaned up). Byte Bridge merely speculates that because "IPE and Byte Bridge operate in the same industry, there is a reasonable inference that Mr. Breville misappropriated the information from Byte Bridge for the benefit of his new company, IPE, thereby establishing IPE's vicarious liability." (Pl.'s Br. at 8–9.) This is woefully insufficient to establish actual use of the alleged trade secret.

emailed Marvin Cunanan and Alisha Tominaga. (Breville Decl. ¶¶ 51–52; Ex. 9.) Byte Bridge never responded to the email, and waited over three months to send him the first demand letter, on June 1, 2026. (Breville Decl. ¶¶ 53–54.) Dr. Breville responded by email the very next day. (*Id.* ¶ 54.) Byte Bridge took 16 days to respond to that email, with another demand letter. (*Id.*) Dr. Breville responded to the second demand letter four days later, on June 22. (*Id.*) Byte Bridge sent him no further correspondence, despite Dr. Breville's specific requests for Byte Bridge to identify with specificity the trade secrets or confidential information allegedly retained, the copyrighted materials allegedly infringed, the trademark or ownership rights allegedly violated, the customers allegedly solicited, and the factual basis for its monetary demand.

Byte Bridge waited nearly two months after that to file this lawsuit and request injunctive relief. Its multiple delays suggest a lack of urgency and irreparable harm. *See, e.g.*, *Kunaknana v. U.S. Army Corps of Eng'rs*, No. 13-CV-00044-SLG, 2014 WL 975592, at *3 (D. Alaska Mar. 12, 2014) ("[T]he fact that Plaintiffs waited to file their motion until two months after CPAI began its construction season militates against a finding of irreparable harm."); *Contender Partners, LLC v. Azteca Int'l Corp.*, No. 08-02026 MMM (JTLx), 2008 WL 11334492, at *24 (C.D. Cal. May 19, 2008) (finding failure to show irreparable harm where the plaintiff "wait[ed] nearly three months from the time it sent a cease and desist letter before serving its complaint and moving for preliminary injunction"); *Adir Int'l, LLC v. Unicomer S.A. de C.V.*, No. CV 07-01314 MMM (CTX), 2007 WL 10094750, at *23 (C.D. Cal. Nov. 19, 2007) (delay of "seven months before seeking an injunction" supported finding of lack of irreparable harm); *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (unexplained delay of two months in sending a cease-and-desist letter, followed by unexplained delay of five months in moving for injunctive relief, precluded a finding of irreparable harm).

As one district court held in a trade secret case with far greater evidence of threatened injury than the thin record before this Court, the plaintiff's delay of seven months after first suspecting misappropriation showed there was no exigent need for injunctive relief. *See Diversified Silicone*, 2020 WL 4390380, at *3. That court denied a preliminary injunction because of the delay, and this Court should too. *See id.* at *3–4.

**2. Byte Bridge has no evidence of any actual or threatened irreparable harm.**

Regardless of Byte Bridge's delay, Byte Bridge has shown no threat of irreparable harm. Byte Bridge advances two theories of irreparable harm—loss of its claimed trade secrets, and loss of prospective customers and goodwill—and neither is supported by evidence.

As a preliminary matter, Byte Bridge's carefully worded statement that "California courts have presumed irreparable harm when proprietary information is misappropriated" fails to accurately describe the current state of the law. (Pl.'s Br. at 9 (citation omitted).) "District courts in the Ninth Circuit have been divided on whether irreparable harm may be presumed in trade secret misappropriation cases." *Luminate Home Loans, Inc. v. Better Mortg. Co.*, No. 24-CV-02251-BAS-MSB, 2025 WL 437903, at *4 (S.D. Cal. Feb. 7, 2025). "While the Ninth Circuit has not directly addressed whether [Supreme Court precedent] precludes presuming irreparable harm in trade secret cases," *id.*, it has, in an unpublished case, rejected the argument that trade secret misappropriation always leads to at least a presumption of future irreparable harm, and explained permanent injunctive relief does not "automatically flow[ ]" from a successful trade secret misappropriation claim. *Citcon USA, LLC v. RiverPay Inc.*, No. 20-16929, 2022 WL 287563, at *2 (9th Cir. Jan. 31, 2022) (mem. op.) ("We are not obligated to grant injunctive relief in trade secrets cases . . . . The district court's decision to deny [the] motion for an injunction was not an abuse of discretion."). And the court has explicitly rejected such a presumption in copyright and trademark cases, *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) (copyright infringement); *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999) (trademark infringement), while the Supreme Court has held similarly with respect to patent infringement, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

This Court, consistent with other courts in this Circuit, has looked to these authorities in declining to presume irreparable harm in cases alleging trade secret misappropriation. *Zendar Inc. v. Hanks*, No. 20-CV-03391-JSW, 2020 WL 4458903, at *5 (N.D. Cal. May 27, 2020) ("[T]he Court is not persuaded that a presumption of irreparable harm is appropriate."); *see also, e.g.*, *Luminate*, 2025 WL 437903, at *4 ("[T]his Court aligns with those that require concrete evidence

rather than relying on presumptions in this instant action."); *Cutera*, 444 F. Supp. 3d at 1208 (declining to apply presumption and noting the Ninth Circuit has not yet addressed the issue in the context of trade secrets*); V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013) (citing *Flexible Lifeline* in declining to presume irreparable harm for a trade secret claim).

This Court should follow these recent cases and decline to presume irreparable harm. In any event, no presumption could apply here, because Byte Bridge has not shown that it possesses a trade secret at all, let alone one that Dr. Breville or his company misappropriated. A presumption of harm cannot substitute for the threshold showing Byte Bridge has failed to make.

Byte Bridge also argues that Dr. Breville's alleged "misappropriation and use of the FLCC program threatens Plaintiff with loss of prospective customers and goodwill." (Pl.'s Br. at 10.) But Byte Bridge has no evidence that it is at imminent risk of losing either. Byte Bridge's allegations that Dr. Breville solicited its "customers and/or partners by offering them IPE Solution's [sic] version of the FLCC program" and "targeted Byte Bridge's customers by using Byte Bridge's proprietary information he obtained while employed at Byte Bridge," and that "Byte Bridge has suffered and continues to suffer damages in loss of goodwill, business opportunities, and a strong likelihood of confusion in the industry" are made only on information and belief. (Cunanan Decl. ¶ 11.) Dr. Breville states under oath that since leaving Byte Bridge, he has not solicited any Byte Bridge client, customer, or employee, he does not compete for Byte Bridge's reselling and integration business, and he has never discouraged anyone from working with Byte Bridge. (Breville Decl. ¶¶ 43, 44, 46.) Instead, he has touted Byte Bridge's business and recommended its services at industry events since his departure. (*Id.* ¶ 47.)

A single declarant's stated belief, contradicted by sworn testimony from the only person with firsthand knowledge, is insufficient to support a preliminary injunction. *See Diversified Silicone*, 2020 WL 4390380, at *3 ("Plaintiffs have not provided any evidence aside from Ubelhoer's own belief that Plaintiffs have lost business or goodwill because of Defendant's actions."). Similarly speculative is Mr. Cunanan's statement that "if a competitor accessed the FLCC program and its underlying materials, that competitor *could* benefit from insight into Plaintiff's marketing strategies, business plans, and non-public details about existing and prospective clients and employees

with little time and minimal cost." (Cunanan Decl. ¶ 6 (emphasis added)); *see Haaland*, 762 F. Supp. 3d at 897–98 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." (quoting *Baldrige*, 844 F.2d at 674)). Byte Bridge does not attempt to explain *how* a slide deck surveying the publicly available fundamentals of liquid cooling could reveal Byte Bridge's "marketing strategies, business plans, and non-public details about existing and prospective clients and employees." The FLCC Handout contains none of those things. The notion that access to such material would hand a competitor an unfair advantage "with little time and minimal cost" is pure conjecture, unsupported by any evidence connecting the actual contents of the FLCC Handout to any of the business-sensitive categories Cunanan invokes. And the conjecture is further undermined by the fact that Byte Bridge itself freely distributed the FLCC Handout to employees of other companies around the world.

**D. The balance of hardships does not tip in Byte Bridge's favor, and a preliminary injunction is not in the public interest.**

In considering a preliminary injunction motion, a court must identify the harms a preliminary injunction might cause to the defendant and weigh these against the plaintiff's threatened injury. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Where, as here, a plaintiff does not make a strong showing of a likelihood of success on the merits, then "it must show that the balance of harm tips strongly in its favor." *Clements v. Alan Ritchey, Inc.*, 165 F. Supp. 2d 1068, 1082 (N.D. Cal. 2001). Byte Bridge has not shown that it has been harmed at all, let alone that it will bear any burden if the Court does not grant a preliminary injunction.

Byte Bridge's failure to act tips the equities in Defendants' favor. The burden on Defendants is not merely complying with the law (they already are). The burden on Defendants is Byte Bridge's weaponization of litigation that could have been avoided if Byte Bridge simply responded to Dr. Breville's repeated requests for specificity regarding its claims and his repeated offers to resolve the dispute through constructive dialogue—requests that Byte Bridge ignored for months before filing this lawsuit.

As previously demonstrated, the only alleged trade secret information that Byte Bridge

identifies with any particularity is the information contained in the FLCC Handout. Dr. Breville has already agreed to return or destroy the PDF copy of the FLCC Handout that he possesses, and he states that he does not possess any other Byte Bridge information (Breville Decl. ¶¶ 58–60.) Accordingly, the relief Byte Bridge seeks goes far beyond what is warranted and such an overly broad and burdensome preliminary injunction would greatly harm Defendants (as further discussed below). Moreover, to the extent that Byte Bridge seeks to prohibit Dr. Breville from using his current course, this would cause Defendants great financial hardship and strongly tip the balance of harms in Defendants' favor. *See Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 910–11 (N.D. Cal. 2014) ("A preliminary injunction is a drastic remedy and the hardship on a preliminarily enjoined party who is required to withdraw its product from the market before trial can be devastating.").

Furthermore, a preliminary injunction is not in the public interest. Courts "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. California courts have identified two competing public interests where trade secret cases involve former employees. On the one hand, California has a "settled legislative policy in favor of open competition and employee mobility, protecting the important legal right of persons to engage in businesses and occupations of their choosing." *Cutera*, 444 F. Supp. 3d at 1210. On the other hand, the state also has a "strong policy in favor of protecting trade secrets." *Id.* But punitive restrictions are ordinarily inappropriate when information is no longer secret and the defendant "retains no unfair advantage." *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 890126, at *4 (N.D. Cal. Jan. 23, 2013) (quoting *DVD Copy Ctrl.*, 116 Cal. App. 4th at 253–54).

Byte Bridge has failed to establish a likelihood of success on the merits of its trade secrets claim, there is no public interest in protecting what Byte Bridge has not shown to be a trade secret, and thus there is no public interest in granting the preliminary injunction Byte Bridge seeks. Moreover, Byte Bridge's proposal is not confined to an identified confidential passage, compilation, or technical process. It would restrain an entire course about a publicly discussed technology and restrict Defendants' communications with potential customers. Protecting lawful competition does

not permit misappropriation, but neither does protecting trade secrets permit a court to convert public industry knowledge into a judicially imposed noncompete restriction. The Court should decline to issue the broad injunction Byte Bridge requests.

**II. Byte Bridge's overbroad request for expedited discovery should be denied.**

The Court has already issued an order to preserve potentially relevant evidence. (Order Denying Mot. for TRO, ECF No. 14 at 1.) Byte Bridge offers no evidence that Defendants have violated that order or attempted to destroy evidence (and they have not done so). Its remaining demands go far beyond preservation and amount to a motion for expedited discovery in all but name.[5] Byte Bridge seeks access to Defendants' computers, storage devices, email accounts, cloud accounts, smartphones, operating systems, domains, servers, user identifications, and passwords, with authority for Byte Bridge's agents to mirror all of the data therein. (Pl.'s Mot. for TRO at 3–5.) Byte Bridge has the burden of showing that "the need for expedited discovery outweighs the prejudice to the [targeted] party." *Valna Holding Cypress Ltd v. BiBo Biopharma Eng'g Co. Ltd.*, No. 25-CV-03328-KAW, 2026 WL 594387, at *2 (N.D. Cal. Mar. 3, 2026).

Byte Bridge fails to do so. It offers no reasonable grounds for its shockingly broad requests to image and obtain nearly every piece of data in Defendants' possession. *Hudson Martin Ferrante St. Witten & Demaria, PC v. Forsythe*, No. 16-cv-06551-BLF (SVK), 2017 WL 550242, at *2 (N.D. Cal. Feb. 10, 2017) (denying motion for expedited discovery in part because the "proffered requests are overbroad"). A motion that "seeks flash copies of entire devices and fails to limit its requests to discovery of information that may be relevant to the possession of" the information at issue is not only overbroad but also "rais[es] issues of privacy." *Id.*; *see Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1069 (C.D. Cal. 2009) (denying motion for expedited discovery in part because the request "would allow plaintiff to obtain all information on defendants' internal and external hard drives"). The requests would expose Defendants' unrelated personal, customer, and business information before Byte Bridge has established that its information is a trade secret or that Defendants

[5] Byte Bridge has not, however, asserted that it needs expedited discovery to obtain proof to support its motion for a preliminary injunction.

misappropriated it. It would also place a heavy burden on Defendants to comply. *See Hudson Martin*, 2017 WL 550242, at *3. Byte Bridge fails to meet its burden, and the existing preservation order is sufficient while the motion for a preliminary injunction is adjudicated.

**CONCLUSION**

For the reasons discussed above, the motion for a preliminary injunction should be denied.

Dated: September 16, 2026

By: */ s/ C. Griffith Towle*
Charles Griffith Towle (CA SBN 146401)
gtowle@bartkopavia.com
BARTKO PAVIA LLP
1100 Sansome Street
San Francisco, CA 94111
Tel.: (415) 956-1900

Thomas G. Pasternak (*pro hac vice pending*)
tpasternak@taftlaw.com
Benjamin S. Morrell (*pro hac vice pending*)
bmorrell@taftlaw.com
TAFT, STETTINIUS & HOLLISTER LLP
111 E. Wacker Dr., Ste. 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011

*Attorneys for Defendants Curtis H. Breville and Breville Enterprises LLC*

**CERTIFICATE OF SERVICE**

I, Charles Griffith Towle, pursuant to 28 U.S.C. § 1746, declare as follows:

On the date listed below, Defendants served filed ECF-stamped copies of the foregoing document, along with the attached declaration and exhibits, on the following counsel of record via email:

JOHN C. KIRKE, #175055
jkirke@donahue.com
CHANCELLOR W. TSENG, #322236
CTseng@donahue.com
DONAHUE FITZGERALD LLP
1999 Harrison Street, 26th Floor
Oakland, CA 94612-3520
Telephone: (510) 451-3300
Facsimile: (510) 451-1527

Date: September 16, 2026

*/s/ C. Griffith Towle*