JOHN C. KIRKE, #175055
jkirke@donahue.com
CHANCELLOR W. TSENG, #322236
ctseng@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone: (510) 451-3300
Facsimile: (510) 451-1527

Attorneys for Plaintiff,
BYTE BRIDGE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BYTE BRIDGE, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>CURTIS H. BREVILLE, an individual; C.H. BREVILLE ENTERPRISES LLC, a Colorado limited liability company, dba IPE SOLUTIONS; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 3:26-cv-08627-WHO<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 14, 2026<br>Time: 2:00 P.M.<br>Dept.: Courtroom 2 – 17th Floor |

# TABLE OF CONTENTS


| | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. ARGUMENT | 1 |
| A. Byte Bridge Demonstrated it is Likely to Succeed on the Merits. | 1 |
| 1. Byte Bridge Protected its FLCC Program When it Obtained NDAs and Confidentiality Agreements from Attendees. | 2 |
| 2. The FLCC Handout Was Secret and Proprietary. Clients Paid for it, and Breville Agreed it Gave an Industry-First Competitive Advantage. | 3 |
| 3. Mr. Breville, Mr. Raina, and Mr. Cunanan Jointly Developed the FLCC Handout for Byte Bridge, who Credited Mr. Raina With the Idea. | 5 |
| B. Plaintiff Will Suffer Imminent and Irreparable Harm Absent Injunctive Relief. | 7 |
| 1. Mr. Breville Admits he Misappropriated Byte Bridge's FLCC Handout. | 7 |
| 2. Mr. Breville Already Targeted Byte Bridge's Chinese Customer, Which Irreparably Harmed Byte Bridge. | 7 |
| 3. Irreparable Harm is Presumed with Trade Secret Misappropriation. | 8 |
| C. The Balance of Hardships Weighs in Byte Bridge's Favor. | 8 |
| 1. Mr. Breville's Hands are Unclean. Protecting Byte Bridge's Trade Secrets Furthers the Public Interest. | 8 |
| 2. Byte Bridge has not Delayed in Seeking Injunctive Relief. | 9 |
| D. Byte Bridge Made its Motion Pursuant to the DTSA, CUTSA, Lanham Act, Employment and Confidentiality Agreement, and Severance Agreement. | 10 |
| 1. Byte Bridge Carried its Burden in Proving it is Likely to Succeed on its Breach of Contract Claim. | 11 |
| 2. Byte Bridge Can Prove a Likelihood of Confusion. | 12 |
| III. CONCLUSION | 13 |

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Albert's Organics, Inc. v. Holzman*,
445 F. Supp. 3d 463 (N.D. Cal. 2020) ....................3, 8

*Andersen v. Stability AI Ltd.*,
744 F. Supp. 3d 956 (N.D. Cal. 2024) ....................12

*Arc of California v. Douglas*
757 F.3d 975 (9th Cir. 2014)....................10

*Bambu Franchising, LLC v. Nguyen*,
537 F. Supp. 3d 1066 (N.D. Cal. 2021) ....................1, 3

*Beluca Ventures LLC v. Einride Aktiebolag*,
660 F. Supp. 3d 898 (N.D. Cal. 2023) ....................4

*Buffets, Inc. v Klinke*,
73 F.3d 965....................2

*Comet Techs. USA Inc. v. Beuerman*,
No. 18-CV- 01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ....................9

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*
444 F. Supp. 3d 1198 (E.D. Cal. 2020)....................3, 5

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019)....................10

*Henry Schein, Inc. v. Cook*,
191 F.Supp.3d 1072 (N.D. Cal. 2016) ....................9

*Henry Schein, Inc. v. Cook*,
No. 16-cv-03166-JST, 2016 WL 3418537 (N.D. Cal. Jun. 22, 2016) ....................8

*InteliClear, LLC v. ETC Global Holdings, Inc.*,
978 F.3d 653 (9th Cir. 2020)....................5

*Luminate Home Loans, Inc. v. Better Mortgage Co.*,
No. 24-cv-02251-BAS-MSB, 2025 WL 437903 (S.D. Cal. Feb. 7, 2025) ....................8

*Lydo Enterprises, Inc. v. City of Las Vegas*,
745 F.2d 1211 (9th Cir. 1984)....................10

*In re Meta Pixel Healthcare Litig.*
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................9, 10

*Stiner v. Brookdale Senior Living, Inc.*,
665 F. Supp. 3d 1150 ........................................................................................................11

*WeRide Corp. v. Huang*,
379 F. Supp. 3d 834 (N.D. Cal. 2019) .....................................................................1, 2, 9

*Zendar, Inc. v. Hanks*,
No. 20-cv-03391-JSW, 2020 WL 4458903 (N.D. Cal. May 27, 2020) .......................................8

**Federal Statutes**

DTSA, CUTSA ........................................................................................................10

Lanham Act ........................................................................................................1, 10 12

## I. INTRODUCTION

Plaintiff Byte Bridge, Inc. carried its burden in demonstrating it is likely to succeed on the merits of trade secret misappropriation. Byte Bridge produces emails showing Sundeep Raina first came up with the FLCC training framework. Mr. Raina asked Defendant Breville to execute creating the FLCC Handout in the course and scope of his Byte Bridge employment. Byte Bridge maintained the FLCC Handout's secrecy when it consistently charged training fees and obtained confidentiality agreements from attendees. Byte Bridge also clearly designated the FLCC Handout as "proprietary and confidential." Emails also show Defendant Breville was aware the FLCC Handout was subject to NDAs.

Mr. Breville's 2025 communications prove the FLCC Handout and training program was developed at Byte Bridge for its current and potential customers. Mr. Breville's communications show he agreed the FLCC Handout was an industry first. Mr. Breville also used the FLCC Handout and training to attract potential Byte Bridge customers. Therefore, Mr. Breville's own admissions and actions prove the FLCC Handout conferred economic benefit and competitive advantage. Any alleged public nature of information within the FLCC Handout is not the accurate standard to define trade secrets, which can involve compilations of public information.

Finally, Mr. Breville's opposition openly admits he took and kept the FLCC Handout. Coupled with Byte Bridge's evidence that Mr. Breville has actually poached current and existing Byte Bridge customers as recently as August 2026, the Court should find Byte Bridge is likely to demonstrate trade secret misappropriation, false designation of origin under the Lanham Act, and breach of contract. The Court should enjoin Defendants' use of the FLCC Handout.

## II. ARGUMENT

### A. Byte Bridge Demonstrated it is Likely to Succeed on the Merits.

"At the preliminary injunction stage, [Byte Bridge] must meet the high standard of showing it is likely to succeed on the merits, but it is not required to prove its case." *WeRide Corp. v. Huang*, 379 F. Supp. 3d 834, 848–49 (N.D. Cal. 2019). Plaintiff need only show a likelihood of success on its claim, not unassailable proof. *Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1075 (N.D. Cal. 2021) (citing *WeRide*, 379 F. Supp. 3d at 848–49 (N.D. Cal. 2019)).

### 1. Byte Bridge Protected its FLCC Program When it Obtained NDAs and Confidentiality Agreements from Attendees.

Defendants argue the FLCC Handout was widely and indiscriminately distributed without the imposition of any confidentiality requirements on attendees. (Oppo., § I.B.1.) Defendants are factually mistaken because Byte Bridge did obtain confidentiality agreements from training attendees. (Cunanan Reply Decl., ¶¶ 5–7, **Exh. F**.) As further explained in the Cunanan Reply Declaration, FLCC training attendees were subject to confidentiality agreements one of two ways: a "FLCC Participation Confirmation Form" which contained a confidentiality clause; or pre-existing commercial contracts like Master Services Agreements and actual Non-Disclosure Agreements ("NDAs"). (*Id.*). Indeed, on July 16, 2025, Mr. Breville was directly copied on an email indicating the FLCC Handout was to be sent to a client only after the client signed a separate NDA. (Raina Reply Decl., ¶¶ 5–6, **Exh. B**.) Further, it is undisputed Byte Bridge clearly marked and designated the FLCC Handout as confidential and proprietary on the bottom right corner of the majority of slides. (Oppo., 12:1–2.) Finally, not all attendees were given the FLCC Handout; attendees in Dubai and Abu Dhabi were not given the FLCC Handout. (Raina Reply Decl., ¶ 6.)

The case law Defendants cite only benefits Byte Bridge's position. (Oppo., 12:9–24.) We agree with Defendants' argument that "limited or obscure publication does not invariably destroy secrecy[.]" (Oppo., 12:9) (citing *WeRide*, 379 F.Supp. 3d at 847.) As in *WeRide*, Byte Bridge implemented the above-described "reasonable efforts to protect the secrecy" of the FLCC Handout. It was also Mr. Breville's shared opinion via Microsoft Teams chats with Mr. Raina that the FLCC training was an industry first which provided Byte Bridge with economic and competitive advantage. (Raina Reply Decl., ¶ 4, **Exh. A**.) Moreover, and importantly, Byte Bridge required attendees to pay a training fee, as indicated within each FLCC Participation Confirmation Form. A training fee further indicates the FLCC Handout and training program as having independent economic value. The Court should disregard Defendants' attempt to now construe the FLCC Handout and training as having no economic value.

Defendants also cite *Buffets, Inc. v Klinke*, 73 F.3d 965, 969. In *Buffets*, purely "stamping them 'confidential'" was insufficient. *Id.* Here, Byte Bridge not only marked the majority of slides

as "confidential and proprietary", Byte Bridge also required participants to sign the "FLCC Participation Confirmation Form" which contained a confidentiality clause. (Cunanan Reply Decl., ¶¶ 5–7, **Exh. F**.) Byte Bridge also specifically sent clients handouts on two occasions subject to first obtaining separately executed NDAs. (*Id.*) Therefore, Byte Bridge "attempted to keep [the FLCC Handout] secret", as required by *Cutera, Inc. v. Lutronic Aesthetics, Inc.* 444 F. Supp. 3d 1198, 1205 (E.D. Cal. 2020).

Therefore, the Court should find that Byte Bridge did "employ reasonable measures to maintain the secrecy" of the FLCC Handout, and the evidence presented is sufficient at the preliminary injunction stage. *Bambu Franchising*, 537 F. Supp. 3d at 1073–74 (finding trade secret with confidentiality and non-disclosure agreements; conspicuous "Confidential" markings; and even providing a physical copy.)

**2. The FLCC Handout Was Secret and Proprietary. Clients Paid for it, and Breville Agreed it Gave an Industry-First Competitive Advantage.**

Defendants argue the FLCC program is not a trade secret because the information within was already in the public domain. (Oppo., § I.B.2.) Defendants also argue that "information without independent economic value does not support a misappropriation claim." (Oppo. 14:15–16.) However, Defendants also admit that "a compilation of information may sometimes qualify for protection even if its individual elements are generally known[.]" (Oppo., 14:5–6.)

First, Defendants' "Comparison of FLCC Handout Slides with Publicly Available Information" provides an incomplete analysis on all Six (6) Modules spanning 75+ slides by only discussing 8 slides contained within the FLCC Handout. (Oppo., Breville Decl., **Exh. 3** (redacted).) Defendants have not only failed to convincingly demonstrate the FLCC Handout contains only publicly available information, trade secret law does not invalidate protections simply based on the public availability of content within such trade secrets.

Second, the correct definition of a trade secret under the DTSA and the CUTSA is: information that "derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 471–72 (N.D. Cal. 2020). This Court

further recognized that "customer related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives…including ideas and plans for product enhancements" all constituted trade secrets. *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal. 2023) (citing *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1048 (N.D. Cal. 2020)).

As Mr. Raina indicated in his declaration, his idea for the FLCC training course was specifically aimed at bridging a gap Mr. Raina identified based on conversations with prospective clients. (Raina Reply Decl., ¶ 3.) The FLCC program was to provide a certification of liquid cooling techniques independent of any particular manufacturer's processes or specific requirements. (*Id.*) The FLCC Handout and training course was therefore developed at Byte Bridge specifically with "customer related information" and contained "marketing plans and strategic business development initiatives." The FLCC Handout and training course actually included ideas and plans for product enhancements. (*See* Breville Decl., **Exh. 2**, "FLCC Handout", pg. 10 [comparing different immersion cooling practices]; pg. 15 [discussing immersion cooling challenges]; pg. 17 [identifying pros and cons]; and pg. 19 [providing specific planning tips and architecture & design recommendations].) Therefore, the FLCC Handout is a trade secret under the DTSA and CUTSA.

Emails and Microsoft Teams messages also show Mr. Breville and Mr. Raina's agreement and treatment that the FLCC Handout and training was an industry first. (Raina Reply Decl., ¶ 4, **Exh. A**.) Mr. Breville certainly believed in 2025 that the FLCC training provided Byte Bridge with a competitive edge. (*Id.*) Mr. Breville wrote in a Teams message "We are delivering the industry's first Foundational Liquid Cooling Certification. Much more impressive, much more valuable." (*Id.*) Moreover, Mr. Breville was using the FLCC training program as a tool to attract partnerships with potential clients. (*Id.*)

In fact, there were internal discussions to continue building a different, more advanced and developed version of the FLCC training. Emails with Byte Bridge's marketing department indicated the company's intent to continue developing the FLCC training course. (Raina Reply Decl., ¶ 5, **Exh. B**.) These emails show Mr. Breville's direct and active involvement with Byte Bridge's attempts to develop the FLCC program to provide the company, not Mr. Breville individually, with

economic and competitive advantage in the industry. Based on Mr. Breville's 2025 messages, Mr. Breville cannot now fairly claim, and the Court should estop him from claiming, the FLCC work he was a part of in 2025 at Byte Bridge had no independent economic value. (Oppo., 14:15–20.)

Further support finding independent economic value comes from the FLCC Participation Confirmation Form itself, which shows that Byte Bridge took a training participation fee from attendees. (Cunanan Reply Decl., **Exh. F**.) Indeed, gatekeeping access with subscription fees is part of Defendants' own pricing strategy. (*See generally*, Breville Decl., ¶¶ 39–42.)

Again, the case law Defendants cite only benefits Byte Bridge's position. (Oppo., 13:4–9.) In *InteliClear*, the court imposed trade secret protections for information being "uncommon" and "unique in the industry", coupled with reasonable measures taken to maintain secrecy via confidentiality agreements and commercial contracts. *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 660–61 (9th Cir. 2020). In *Cutera*, the standard was also "efforts that are reasonable under the circumstances to maintain its secrecy." *Cutera, Inc.*, 444 F. Supp. 3d at 1206–07. As demonstrated above, Mr. Breville himself treated the FLCC Handout as "unique in the industry", and Byte Bridge took reasonable measures to maintain secrecy with its confidentiality agreements within the "FLCC Participation Confirmation Forms" and separately executed NDAs.

**3. Mr. Breville, Mr. Raina, and Mr. Cunanan Jointly Developed the FLCC Handout for Byte Bridge, who Credited Mr. Raina With the Idea.**

On February 13, 2025, Mr. Raina emailed a proposed list of training topics entitled "Liquid Cooling Techniques: Comprehensive Training Program" to Mr. Breville. (Raina Reply Decl., ¶¶ 4–5, **Exh. A**.) Moments later, Mr. Breville acknowledged Mr. Raina's email saying to "Keep the info coming and I'm currently building the internal training, which will be repurposed for external training. Keep the great ideas flowing!" (*Id.*) Therefore, Mr. Breville admitted the FLCC training program was Mr. Raina's idea, and that he built the FLCC Handout in the course and scope of his Byte Bridge employment for his employer's benefit.

Mr. Breville and Mr. Raina went on to continue collaborating on the FLCC Handout and training together over Microsoft Teams throughout 2025. (*Id.*; *see also* Raina Reply Decl., **Exh. B**.) Mr. Breville and Mr. Raina would exchange ideas on how to improve the FLCC training for

Byte Bridge customers and potential customers. (*Id.*) On May 6, 2025, Mr. Breville even explicitly suggested via email that Byte Bridge should trademark "FLCC" "so that nobody else can copy it and put out their own." (Cunanan Motion Decl., **Exh. D**.) Mr. Breville wrote this email from his Byte Bridge email account in the course and scope of his employment. Mr. Breville's statement reveals his own belief in May 2025 that the FLCC program was Byte Bridge property. These emails and Microsoft Teams messages exchanged between Mr. Breville, Mr. Raina, and other Byte Bridge employees show Byte Bridge's active development of the FLCC Handout. Mr. Breville clearly helped develop the FLCC program for Byte Bridge as its employee.

When Byte Bridge gave Mr. Raina his 2025 Mid-Year Performance Review, Mr. Cunanan specifically called out Mr. Raina's contributions towards creating the FLCC program. (Raina Reply Decl., ¶ 7, **Exh. C**.) Specifically, Mr. Cunanan said: "Sundeep is a valuable asset to our organization…Sundeep has been very helpfu[l] in providing guidance on the market in the regions he supports and also marketing and sales tactics (IE: FLCC)[.]" (*Id.*) Therefore, Byte Bridge's business records contemporaneously created at the time confirm Mr. Raina's involvement in creating the FLCC Handout and training program.

Further, whatever Mr. Breville created within the FLCC Handout was subject to the contractual and proprietary terms under his Employment Agreement. (Motion, §§ II.B and IV.C; Cunanan Motion Decl., ¶ 4, **Exh. A**.) Mr. Breville signed away his inventions in the course and scope of his Byte Bridge employment as company property, which included the FLCC Handout. Under Section 2.5.3 of his Employment Agreement, Mr. Breville assigned all "work performed for Byte Bridge" directly to Byte Bridge as "works made for hire." Byte Bridge has produced sufficient documentary evidence showing Mr. Breville's work developing the FLCC Handout indicates the FLCC Handout was "work performed for Byte Bridge" and therefore a "work made for hire."

Contractually, Mr. Breville also agreed under his Employment Agreement that he would disclose all prior inventions (Dkt. 6–2, **Exh. A "Emp. Agt."**, § 4); he did not disclose any such prior inventions (Dkt. 6–2, Emp. Agt., Exhibit A Prior Inventions); and he did not bring any property from any previous employers (Dkt. 6–2, Emp. Agt., § 5.1.) Mr. Breville also did not produce any evidence supporting or indicating the FLCC Handout was derived from his work while at CoolIT.

Therefore, the Court should not consider Mr. Breville's argument that he brought the framework with him from CoolIT to Byte Bridge. The communications attached to Mr. Raina's declaration indicate the FLCC Handout and training program was a work in progress jointly made by Mr. Breville and the Byte Bridge team throughout 2025.

**B. Plaintiff Will Suffer Imminent and Irreparable Harm Absent Injunctive Relief.**

**1. Mr. Breville Admits he Misappropriated Byte Bridge's FLCC Handout.**

By attaching the FLCC Handout to his declaration, Mr. Breville admits that he kept Byte Bridge's confidential and proprietary information. (Breville Decl., ¶ 60.) Mr. Breville's guilty conscience is apparent, admitting he is aware the FLCC Handout is "Byte Bridge information to return" and suggesting he should not have possession of the FLCC Handout by presumptively offering "to return or destroy that PDF." (*Id.*) In fact, Mr. Breville admits to freely taking materials from his previous employers, in violation of his representations within his Employment Agreement. (*Compare* Breville Decl., ¶ 13 "I brought with me to Byte Bridge the training program I had created while at CoolIT." *with* Cunanan Motion Decl., **Exh. A** Employment Agreement, § 5.1.) Mr. Breville's willingness openly to admit to taking materials from his previous employers showcases his contemptuous candor towards those employers and established work-for-hire principles. As such, the Court should find Byte Bridge is likely to prove Mr. Breville misappropriated trade secrets.

**2. Mr. Breville Already Targeted Byte Bridge's Chinese Customer, Which Irreparably Harmed Byte Bridge.**

Mr. Breville's sworn statement that he "has not solicited any Byte Bridge client, customer" is patently false. Mr. Breville has already and actually targeted Byte Bridge's Chinese customer. As previously referenced in the Motion (§ II.D) and Cunanan Motion Declaration (¶ 9, **Exhibit E**) and confirmed here as well, Mr. Breville targeted Byte Bridge's pre-existing Chinese customer, Xiaoyu Liu of GDS. (Cunanan Reply Decl., ¶ 8.) Xiaoyu Liu of GDS is an existing Byte Bridge customer in China. (*Id.*) In August 2026, Mr. Breville posted on LinkedIn that Xiaoyu Liu took Mr. Breville's infringing version of the FLCC program branded under IPE Solutions. (*Id.*) Therefore, Byte Bridge's injury is not speculative as Mr. Breville suggests, but actual and ongoing. (Oppo., 20:22–21:11.) Byte Bridge's actual injury, as well as demonstration that actual consumer

confusion is ongoing, supports the Court finding imminent and irreparable injury.

**3. Irreparable Harm is Presumed with Trade Secret Misappropriation.**

Defendants do not convincingly address published case law that "California courts have presumed irreparable harm when proprietary information is misappropriated." *Albert's Organics*, 445 F.Supp.3d at 474 (citation omitted). "This is because such losses would be difficult to quantify in terms of economic value." *Henry Schein, Inc. v. Cook*, No. 16-cv-03166-JST, 2016 WL 3418537, at *8 (N.D. Cal. Jun. 22, 2016) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm")).

Defendants cite a few cases in arguing this Court should not presume irreparable harm with trade secret misappropriation. The Court should disregard Defendants' citation to *Luminate Home Loans, Inc.* as an unpublished opinion rendered outside of this district (Oppo., 19:7–11) (citing *Luminate Home Loans, Inc. v. Better Mortgage Co.*, No. 24-cv-02251-BAS-MSB, 2025 WL 437903 (S.D. Cal. Feb. 7, 2025) ("*Luminate*"). Notwithstanding, *Luminate* supports Byte Bridge's position because the irreparable harm is not speculative, rather actual due to Mr. Breville's poaching of Xiaoyu Liu from GDS—as discussed in the immediately preceding section above. *See Luminate*, at *5 ("Luminate must still 'rely on evidence to establish this type of irreparable harm, not mere speculation of such harm.") Defendants further cite *Zendar* as support. However, *Zendar* also supports Byte Bridge's position. *Zendar, Inc. v. Hanks*, No. 20-cv-03391-JSW, 2020 WL 4458903, at *5 (N.D. Cal. May 27, 2020) (holding evidence suggesting using information to his advantage and to harm the company by exposing IP and confidential information was irreparable harm). In any event, *Zendar* confirmed the "likelihood of irreparable harm" standard governing this Motion. (*Id.* at *6.) Even if the Court does not presume irreparable harm here, Byte Bridge has sufficiently demonstrated a likelihood of irreparable harm.

**C. The Balance of Hardships Weighs in Byte Bridge's Favor.**

**1. Mr. Breville's Hands are Unclean. Protecting Byte Bridge's Trade Secrets Furthers the Public Interest.**

Mr. Breville freely admits to taking material from company to company. (Breville Decl., ¶

13.) Mr. Breville admits he kept Byte Bridge company property. (*Id.* at ¶ 60.) Previously referenced emails show Mr. Breville suggested Byte Bridge trademark the FLCC name in the course and scope of his Byte Bridge employment. (Cunanan Motion Decl., ¶ 8; **Exh. D**.) A year later, Mr. Breville's own trademark filings show his "FLCC" first use date in February 2025 was during his Byte Bridge employment. (Motion, § II.D; **RJN**, ¶¶ 1–3, **Exhs. A–C**.) Mr. Breville's taking and use of the exact "FLCC" name for his own company IPE Solutions shows a complete disregard for the property rights he contractually gave Byte Bridge within his Employment Agreement. (Cunanan Motion Decl., ¶ 4; **Exh. A**, § 2 "Proprietary Information and Inventions".)

Again, courts regularly find that the balance of hardships tips in favor of a plaintiff seeking an injunction prohibiting a defendant from "do[ing] what the law already requires." *See*, *e.g.*, *WeRide*, 379 F.Supp.3d at 854 ("It is no burden for them to do what the law already requires."); *Henry Schein, Inc. v. Cook*, 191 F.Supp.3d 1072, 1077 (N.D. Cal. 2016) (agreeing the balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require [d]efendant to comply with federal and state laws."); *Comet Techs. USA Inc. v. Beuerman*, No. 18-CV- 01441-LHK, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (finding TRO "will result in little meaningful hardship to Defendant" because "[t]he proprietary information at issue belongs to Plaintiff, not Defendant").

Byte Bridge's requested injunctive relief is narrowly tailored to the FLCC program at issue. Byte Bridge is not seeking an overbroad injunction which would interfere with California's policy in favor of open competition, employee mobility, and the right to pursue a business or occupation.

**2. Byte Bridge has not Delayed in Seeking Injunctive Relief.**

Defendants argue Byte Bridge unreasonably delayed in bringing this Motion. (Oppo., § I.C.1.) Importantly, "delay is only one factor among the many that we consider in evaluating whether a plaintiff is likely to suffer irreparable harm absent interim relief." *In re Meta Pixel Healthcare Litig.* 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022) (citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).)

A "two month period between the complaint and the motion for preliminary injunction does not undermine plaintiffs' showing of irreparable injury." *In re Meta,* 647 F. Supp. 3d at 803.

Defendants cite the 9th Circuit's *Oakland Tribune* opinion, which is discussed in Byte Bridge's favor by the *In re Meta* court. *Id.* at 802–03 (citing *Oakland Trib., Inc. v. Chron. Pub. Co.* 762 F.2d 1374, 1377 (9th Cir. 1985) ("In *Oakland Tribune*, for instance, the Ninth Circuit affirmed the denial of a preliminary injunction where 'the exclusivity provisions which plaintiff seeks to enjoin have been in effect for a number of *years*.") (emphasis added). "[O]ther Ninth Circuit decisions suggest that waiting two months before seeking an injunction does not lessen a claim of irreparable harm." *Id.* (*comparing* a two-month delay in *Arc of California v. Douglas,* 757 F.3d 975, 990 (9th Cir. 2014) *with* a two year delay in *Cuviello*, 944 F.3d at 833, *and* a five year delay in *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213–14 (9th Cir. 1984).)

As detailed above, Byte Bridge first learned of Mr. Breville's actual poaching of Byte Bridge's existing customer after Mr. Breville's August 2026 LinkedIn post. (Cunanan Motion Decl., **Exh. E**; Cunanan Reply Decl., ¶ 8.) Byte Bridge shortly initiated this action on August 19, 2026. Byte Bridge's pre-suit demand letters were sent in June 2026 only a few months after Mr. Breville's February 2026 launch of IPE Solutions. (Breville Decl., ¶¶ 51–55.) In accordance with *In re Meta*'s analysis of *Oakland Tribune*, the Court should not find the time between February and August 2026 as dispositive of irreparable harm. This is particularly true since "delay is only one factor" in evaluating irreparable harm. *In re Meta*, 647 F. Supp. 3d at 802.

**D. Byte Bridge Made its Motion Pursuant to the DTSA, CUTSA, Lanham Act, Employment and Confidentiality Agreement, and Severance Agreement.**

Byte Bridge provided notice that it "makes this Motion pursuant to the DTSA, the CUTSA, the Lanham Act, the Employment and Confidentiality Agreement ("ECA."), and the Severance Agreement and Release." ("SAR") (collectively, "Agreements") (Dkt. 6, Notice Ex Parte Motion for TRO and Preliminary Injunction, 2:7–11.) Byte Bridge also specifically attached and referenced the ECA and the SAR in its Motion and Cunanan Declaration as Exhibits A and B. This is because Byte Bridge's Motion alleges and argues that Mr. Breville entered into these Agreements at the beginning and end of his employment with Byte Bridge. (Dkt. 6, Notice, 2:10–11; Dkt. 6–1, Motion, § II.B–D.) Therefore, Byte Bridge addresses those relevant Counts as well.

/ / /

**1. Byte Bridge Carried its Burden in Proving it is Likely to Succeed on its Breach of Contract Claim.**

It is undisputed that the Agreements were binding written contracts entered into between the Parties. (*See generally*, Opposition.) Mr. Breville's Opposition raises new questions regarding these Agreements: he is now alleging that "Since March 2020, he has been the founder and CEO of Defendant C. H. Breville Enterprises LLC". (Oppo., § I.A.) "Generally, 'reply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1179 (citation omitted). Mr. Breville's Opposition raises a new issue, that he was separately and simultaneously operating his own company during his Byte Bridge employment. Mr. Breville's admission has now placed at issue his compliance with the relevant Agreements, including the following provisions of the ECA:

- **Exhibit B, Covenant Not to Compete and Not to Interfere**
    - § 1 "Ability to Provide Services: Employee represents, warrants, and covenants that (1) he or she is not under any contractual or legal obligations with any entity[] that could interfere with the performance of Employee's services."
    - § 3 "Employee or anyone acting on his or her behalf, directly or indirectly, cannot retain or solicit for himself or herself or for another party the services of any of Byte Bridge's clients, employees, or other contractors introduced through Byte Bridge."
- **Exhibit C, Covenant Not to Solicit**
    - §1 "Non-Solicitation and Outside Employment. During the period that Employee is employed by Byte Bridge he or she agrees not to directly or indirectly solicit or offer any services to a client for which the employee will receive compensation or other financial benefits. Further, employee agrees that any outside employment must be communicated to Byte Bridge who reserves the right to restrict such employment during the employee's tenure at Byte Bridge."
- **Exhibit D, Covenant of Confidentiality**
    - § 1 Confidential Information "applies to all information which Employee may acquire, learn, develop, or create by reason of such work or assignment"

In response to Mr. Breville's claim that "Since leaving Byte Bridge, I have not solicited any Byte Bridge clients, customers, or employees" (Breville Decl., ¶ 43), Mr. Breville's Opposition has now also placed at issue his compliance with the one-year non-solicitation agreement contained

within the SAR, § 4 "Limited Non-Solicitation." (Dkt. 6–2, Cunanan Motion Decl., **Exh. B** SAR, § 4.) Mr. Breville agreed to not solicit any of Byte Bridge's clients or customers for twelve (12) months after his employment ended in December 2025. (*Id.*)

Yet Mr. Breville admitted to working for his own company while employed at Byte Bridge. (Oppo., § I.A.) As also demonstrated above, Byte Bridge is likely to prove Mr. Breville did actually poach an existing Byte Bridge Chinese customer. (Motion, § II.D; Cunanan Motion Decl., ¶ 9, **Exh. E**; Cunanan Reply Decl., ¶ 8.) Therefore, Byte Bridge has shown it is likely to succeed on the merits of proving Mr. Breville breached the ECA and SAR. The Court should also order injunctive relief under Byte Bridge's Count VI Breach of Contract.

### 2. Byte Bridge Can Prove a Likelihood of Confusion.

Byte Bridge's opening Motion and Mr. Breville's Opposition addressed Mr. Breville's trademark filings with the United States Patent and Trademark Office ("USPTO"). (Motion, § II.C and D; Opposition, § I.A.) "By using April 27 and 28, 2025 as the date of first use in commerce, Mr. Breville's own USPTO filings admit he first used the FLCC program while he was Byte Bridge's employee." (Motion, § IV.A.1.) Byte Bridge's opening Motion argued Mr. Breville was violating the Lanham Act by selling Byte Bridge's FLCC training under the IPE Solutions brand, thereby causing a strong likelihood of confusion in the industry. (Motion, § IV.A.1, 7:17–22.) Byte Bridge argued that its "damages are ongoing because Defendant continues to use the FLCC program and tradename to date" and "[a]ctual consumers have already begun taking Defendant's FLCC program." (*Id.*; Cunanan Motion Decl., ¶ 9, **Exh. E**.)

The evidence thus far, including Mr. Breville's Opposition admissions, indicates Byte Bridge can prove a likelihood of confusion. "Whether we call the violation infringement, unfair competition, or false designation of origin, the test is identical: is there a 'likelihood of confusion?'" *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 977–78 (N.D. Cal. 2024) (citing *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979)). Byte Bridge presented undisputed evidence that Mr. Breville, through IPE Solutions, offered and gave the FLCC training course to Byte Bridge's existing client. (Motion, § II.D; Cunanan Motion Decl., ¶ 9, **Exh. E**; Cunanan Reply Decl., ¶ 8.) Therefore, Byte Bridge can prove a likelihood of confusion for its Lanham Act claim.

**III. CONCLUSION**

For the foregoing reasons, Plaintiff Byte Bridge respectfully requests the Court grant this Motion for Preliminary Injunction.

Dated: September 30, 2026

Respectfully submitted,

DONAHUE FITZGERALD LLP
Attorneys at Law

By: /s/ Chancellor W. Tseng
John C. Kirke
Chancellor W. Tseng
Attorneys for Plaintiff,
BYTE BRIDGE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of September, 2026, I electronically filed the foregoing **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

C. Griffth Towle
BARTKO PAVIA LLP
1100 Sansome Street
San Francisco, CA 94111
Email: gtowle@bartkopavia.com

*Attorneys for Defendants Curtis H. Breville and Breville Enterprises LLC*

Thomas G. Pasternak (*pro hac vice pending*)
Benjamin S. Morrell (*pro hac vice pending*)
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601
Email: tpasternak@taflaw.com
bmorrell@taftlaw.com

/s/ Chancellor W. Tseng
Chancellor W. Tseng
Attorneys for Plaintiff,
BYTE BRIDGE, INC.