JOHN C. KIRKE, #175055
jkirke@donahue.com
CHANCELLOR W. TSENG, #322236
CTseng@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612-3520
Telephone: (510) 451-3300
Facsimile: (510) 451-1527

Attorneys for Plaintiff,
BYTE BRIDGE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| BYTE BRIDGE, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>CURTIS H. BREVILLE, an individual; C.H. BREVILLE ENTERPRISES LLC, a Colorado limited liability company, dba IPE SOLUTIONS; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 3:26-cv-08627-WHO<br><br>**DECLARATION OF MARVIN CUNANAN IN SUPPORT OF PLAINTIFF'S REPLY TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 14, 2026<br>Time: 2:00 P.M.<br>Dept.: Courtroom 2 – 17th Floor |

I, Marvin Cunanan, declare as follows:

1. I am a Co-Founder and the General Manager of Plaintiff Byte Bridge, Inc. ("Plaintiff" or "Byte Bridge"). I make this declaration in support of Plaintiff's Reply Memorandum of Points and Authorities in support of Plaintiff's Motion for Preliminary Injunction ("Motion"). I am at least 18 years old and have personal knowledge of the facts set forth herein, except as otherwise stated. If called as a witness, I could and would competently testify to these matters.

2. I reviewed Defendant Curtis H. Breville's ("Mr. Breville") Declaration and Exhibits in support of his Opposition to this Motion. Byte Bridge takes issue with numerous inaccuracies contained within Mr. Breville's Declaration ("Breville Declaration").

3. Paragraph 13, 18, and 21 in the Breville Declaration are inaccurate. As testified to within the accompanying Declaration of my colleague Sundeep Raina, the FLCC training course was originally my and Mr. Raina's idea we conceived together at Byte Bridge in early 2025. I hired Mr. Breville for his pre-existing liquid cooling experience to execute creating the FLCC training course for Byte Bridge to offer to existing and potential customers. Mr. Breville did not copy and take the FLCC Handout (Exhibit 2 to the Breville Declaration) from CoolIT, as he alleges in paragraph 13 of his declaration. Emails attached to the Raina Declaration will show that Mr. Raina provided the FLCC framework to Mr. Breville, which Mr. Breville used to help create the FLCC Handout. Emails attached to the Raina Declaration will show Mr. Raina, Mr. Breville, and myself collaboratively working together to create the FLCC Handout and training course.

4. Paragraph 24 in the Breville Declaration is inaccurate. Byte Bridge did not widely distribute the FLCC Handout without enforcing confidentiality and proprietary protections. While the FLCC Handout was printed out for attendees to take notes on, participants paid to attend the trainings and promised to keep the FLCC Handout confidential. At all relevant times, Byte Bridge's business practice and intended business practice was to only provide the FLCC Handout to participants who agreed to written confidentiality agreements. Mr. Breville knew about Byte Bridge's business practice and intended business practice to keep the FLCC Handout confidential. The FLCC Handout was not freely downloadable on any website controlled by Byte Bridge. While

attendees were allowed to take notes on the FLCC Handout and keep their notes, attendees agreed to keep the FLCC Handout confidential.

5. For every presentation identified in paragraph 25 of the Breville Declaration, attendees agreed to written confidentiality agreements. Attendees can be placed into two categories: potential and existing Byte Bridge customers. Potential customers without any pre-existing contractual relationship with Byte Bridge were asked to sign a "FLCC Participation Confirmation Form" ahead of the training. Such forms contained a confidentiality clause: "Confidentiality – All training materials are proprietary to Byte[]Bridge and must not be copied, shared, or misused." Such forms also listed the training fee required for attendees of the FLCC training. Byte Bridge's marketing department created these forms.

6. Existing customers who attended the training were under existing confidentiality agreements contained within Master Services Agreements and/or separately signed Non-Disclosure Agreements between existing clients and Byte Bridge. Because of those existing contracts containing confidentiality agreements, those participants were not required to sign additional FLCC Participation Confirmation Forms for efficiency's sake. However, for the only two instances where Byte Bridge sent clients ([redacted] and [redacted]) with advance copies of the FLCC Handout, Byte Bridge obtained actual NDAs with those clients. Byte Bridge also informed existing customers that the FLCC Handout was confidential and proprietary, protected under the existing commercial agreements between Byte Bridge and its client.

7. Attached as **Exhibit F** are true and correct copies of the FLCC Participation Confirmation Forms, Master Services Agreements and Non-Disclosure Agreements relevant to the FLCC trainings identified in paragraph 25 of the Breville Declaration.

8. Paragraph 43 and 44 of the Breville Declaration are inaccurate. Mr. Breville and his company IPE Solutions have directly targeted Byte Bridge's existing clients and customers on at least one occasion. Earlier this year in August 2026, Mr. Breville posted on his LinkedIn profile that a Chinese customer, Xiaoyu Liu of GDS, took IPE Solutions' FLCC training course. GDS is Byte Bridge's existing customer in China. This is an actual instance of customer confusion. It is Byte Bridge's position that Mr. Breville and IPE Solutions' FLCC training course is unfairly

targeting Byte Bridge business by confusing customers with an identical FLCC training course. A true and correct copy of Mr. Breville's LinkedIn post targeting Byte Bridge's customer was previously attached as **Exhibit E** to the Cunanan Motion Declaration (Dkt. 6–2.)

9. Paragraph 59 of the Breville Declaration is clearly false. Mr. Breville admits in paragraph 60 and Exhibit 2 to his Declaration that he clearly does possess Byte Bridge documents and trade secrets in the form of the FLCC Handout.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this ___ day of September, 2026, at Chicago, Illinois.

September 29, 2026

DocuSigned by:

Marvin Cunanan

738AB714964E4E0...

Marvin Cunanan

# Exhibit F

bytebridge

# FLCC™ PARTICIPATION CONFIRMATION FORM

- **Program Details**

| | |
|---|---|
| **Training Title** | **FLCC™ – Foundational Liquid Cooling Certification** |
| **Organizer** | **ByteBridge Technology Pte. Ltd.** |
| **Date** | 7 October 2025 |
| **Location** | **171 Chin Swee Road, #10-05 CES Centre, Singapore 169877** |
| **Duration** | **9:30am To 4:30pm (Including Lunch)** |

- **Participant Information**

| **Company Name** | **Participant Name** | **Job Title** | **Email** | **Phone No.** |
|---|---|---|---|---|
| [redacted] | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

- **Acknowledgement & Terms**

By signing below, the Participant Company/Individual acknowledges and agrees that:

1. **Participation** – Attendance is confirmed for the listed representatives. Final schedule details (date, time, agenda) will be shared at least 3 days before training.
2. **Fee & Payment** – Training fee of SGD 600 per seat must be fully paid before the session. Entry may be denied if payment is not received.
3. **Cancellation** – Fees are non-refundable. Substitutions are permitted with written notice at least 5 days before the session.
4. **Confidentiality** – All training materials are proprietary to ByteBridge and must not be copied, shared, or misused.
5. **Recording** – Recording, screenshots, or photography are prohibited unless authorized.
6. **Liability** – The Organizer is not liable for indirect losses or cancellations due to force majeure..

**For Participant Company/Individual**:

- Name: 24/09/2025
- Signature: 24/09/2025
- Date: 24/09/2025

[redacted]

| First Name | Family Name | Job Title | Email Address | Phone No. | Monday 6th of October (Y/N) | Tuesday 7th of October (Y/N) |
|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | | Y |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | | Y |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | Y | |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | | Y |
| | | | | | | |
| | | | | | | |

| Special Dietary Requirements<br>N/A if not applicable |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

[redacted]

| First Name | Family Name | Job Title | Email Address | Phone No. | Monday 6th of October (Y/N) | Tuesday 7th of October (Y/N) |
|---|---|---|---|---|---|---|
| [redacted] | | | | | N | Y |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

bytebridge

# FLCC™ PARTICIPATION CONFIRMATION FORM

- **Program Details**

| | |
|---|---|
| **Training Title** | **FLCC™ – Foundational Liquid Cooling Certification** |
| **Organizer** | **ByteBridge Technology Pte. Ltd.** |
| **Date** | 6th Oct 2025 |
| **Location** | **171 Chin Swee Road, #10-05 CES Centre, Singapore 169877** |
| **Duration** | **9:30am To 4:30pm (Including Lunch)** |

- **Participant Information**

| **Company Name** | **Participant Name** | **Job Title** | **Email** | **Phone No.** |
|---|---|---|---|---|
| [redacted] | | | | |
| | | | | |
| | | | | |
| | | | | |

- **Acknowledgement & Terms**

By signing below, the Participant Company/Individual acknowledges and agrees that:

1. **Participation** – Attendance is confirmed for the listed representatives. Final schedule details (date, time, agenda) will be shared at least 3 days before training.
2. **Fee & Payment** – Training fee of 600 per seat must be fully paid before the session. Entry may be denied if payment is not received.
3. **Cancellation** – Fees are non-refundable. Substitutions are permitted with written notice at least 5 days before the session.
4. **Confidentiality** – All training materials are proprietary to ByteBridge and must not be copied, shared, or misused.
5. **Recording** – Recording, screenshots, or photography are prohibited unless authorized.
6. **Liability** – The Organizer is not liable for indirect losses or cancellations due to force majeure..

**For Participant Company/Individual**:

- Name: 26th Sep 2025
- Signature: 26th Sep 2025
- Date: 26th Sep 2025

bytebridge

# FLCC™ PARTICIPATION CONFIRMATION FORM

- **Program Details**

| | |
|---|---|
| **Training Title** | **FLCC™ – Foundational Liquid Cooling Certification** |
| **Organizer** | **ByteBridge Technology Pte. Ltd.** |
| **Date** | 7th October 2025 |
| **Location** | **171 Chin Swee Road, #10-05 CES Centre, Singapore 169877** |
| **Duration** | **9:30am To 4:30pm (Including Lunch)** |

- **Participant Information**

| Company Name | Participant Name | Job Title | Email | Phone No. |
|---|---|---|---|---|
| [redacted] | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

- **Acknowledgement & Terms**

By signing below, the Participant Company/Individual acknowledges and agrees that:

1. **Participation** – Attendance is confirmed for the listed representatives. Final schedule details (date, time, agenda) will be shared at least 3 days before training.
2. **Fee & Payment** – Training fee of 600 per seat must be fully paid before the session. Entry may be denied if payment is not received.
3. **Cancellation** – Fees are non-refundable. Substitutions are permitted with written notice at least 5 days before the session.
4. **Confidentiality** – All training materials are proprietary to ByteBridge and must not be copied, shared, or misused.
5. **Recording** – Recording, screenshots, or photography are prohibited unless authorized.
6. **Liability** – The Organizer is not liable for indirect losses or cancellations due to force majeure..

**For Participant Company/Individual**:

- Name: [redacted]
- Signature:
- Date: 30/9/2025

bytebridge

# FLCC™ PARTICIPATION CONFIRMATION FORM

- **Program Details**

| | |
|---|---|
| **Training Title** | **FLCC™ – Foundational Liquid Cooling Certification** |
| **Organizer** | **ByteBridge Technology Pte. Ltd.** |
| **Date** | 29/09/2025 |
| **Location** | **171 Chin Swee Road, #10-05 CES Centre, Singapore 169877** |
| **Duration** | **9:30am To 4:30pm (Including Lunch)** |

- **Participant Information**

| Company Name | Participant Name | Job Title | Email | Phone No. |
|---|---|---|---|---|
| [redacted] | | | | |
| | | | | |
| | | | | |
| | | | | |

- **Acknowledgement & Terms**

By signing below, the Participant Company/Individual acknowledges and agrees that:

1. **Participation** – Attendance is confirmed for the listed representatives. Final schedule details (date, time, agenda) will be shared at least 3 days before training.
2. **Fee & Payment** – Training fee of 2 per seat must be fully paid before the session. Entry may be denied if payment is not received.
3. **Cancellation** – Fees are non-refundable. Substitutions are permitted with written notice at least 5 days before the session.
4. **Confidentiality** – All training materials are proprietary to ByteBridge and must not be copied, shared, or misused.
5. **Recording** – Recording, screenshots, or photography are prohibited unless authorized.
6. **Liability** – The Organizer is not liable for indirect losses or cancellations due to force majeure..

**For Participant Company/Individual:**

- Name: [redacted]
- Signature: [redacted]
- Date: 29/09/2025 [redacted]

This confidentiality agreement (the **Agreement**) is made **BETWEEN**:

[redacted]

(2) the **Counterparty**, as defined in Clause 1 below

together, the **Parties** and each a **Party**.

The Parties agree as follows:

**1. SPECIFIC DEFINITIONS**

In this Agreement:

| | |
|---|---|
| **Counterparty** | Byte Bridge, Inc.<br>1502 Crocker Avenue<br>Hayward, CA 94544<br>USA |
| **Effective Date** | June 24 2025 |
| **Purpose** | To discuss business opportunities |

**2. GENERAL DEFINITIONS**

In this Agreement:

**Connected Persons** means a Party's directors, officers, employees, managers, agents and professional advisors, suppliers, vendor partners and, in relation to either one of the Parties, any entity sharing common ownership or control with that Party.

**Information** means: (a) the fact that discussions are taking place concerning the Purpose and the status of those discussions; (b) any information of whatever nature relating to the Purpose supplied to a Party (the **Recipient**) or the Recipient's Connected Persons by or on behalf of the other Party (the **Discloser**) in writing, orally or otherwise; (c) any information obtained by a Recipient through: (i) discussions with the Discloser and its Connected Persons; and/or (ii) observation by the Recipient or its Connected Persons at the offices or other premises of the Discloser which relates to the Purpose or to the Discloser's affairs; and (d) any information that would be regarded as confidential by a reasonable business person relating to the business, affairs, customers, suppliers, plans, intentions, market opportunities of the Discloser; <u>but</u> "Information" excludes information which: (e) is in or enters the public domain at the time of its disclosure through no breach by the Recipient or Connected Persons of this Agreement or other obligation of confidentiality; (f) is already in a Recipient's or the Recipient's Connected Persons' lawful possession other than pursuant to disclosure from the Discloser, as at the Effective Date; (g) becomes available to the Recipient or the Recipient's Connected Persons on a non-confidential basis from a source other than Discloser; or (h) is or was independently developed by the Recipient or the Recipient's Connected Persons without using Information.

**person** means a natural person, corporate or unincorporated body (whether or not with separate legal personality) as applicable and that person's legal and personal representatives, successors and permitted assigns.

**Purpose** means the activities or activities set out within clause 1 (*Specific Definitions*) of this Agreement.

**3. OBLIGATIONS OF CONFIDENTIALITY**

3.1 Each Recipient agrees with the Discloser:

(a) it will keep confidential and not, without the Discloser's prior written consent, disclose or make available, in whole or in part, any Information to any person other than Connected Persons (but then only to the extent that such Connected Persons are required to have access to Information for the Purpose);

(b) it will use Information solely in relation to the Purpose;

(c) it will inform each Connected Person to whom disclosure of Information is made (in advance of disclosure) of the terms of this Agreement and ensure each Connected Person adheres to these terms as if that Connected Person were a party to this Agreement (and it will assume sole responsibility for any breach of the terms of this Agreement by any Connected Person);

(d) it will not copy, reduce to writing or otherwise record the Information except as strictly necessary for the Purpose (and any such copies, reductions to writing and records shall be the property of the Discloser);

(e) it will apply the same security measures and degree of care to the Information as the Recipient applies to its own confidential information, which the Recipient warrants as providing adequate protection from unauthorised disclosure, copying or use; and

(f) if any Information is required to be disclosed by: (i) any court of competent jurisdiction or any competent judicial, governmental, supervisory or regulatory body; or (ii) the rules of any stock exchange on which the Recipient's shares or other securities are listed; or (iii) any law or regulation of any country with jurisdiction over the Recipient's affairs, the terms of subparagraph (a) above shall not apply to such disclosure provided that the Recipient will, to the extent permitted by such law or regulatory body, notify the Discloser in writing and cooperate with the Discloser regarding such disclosure or any action which the Discloser may reasonably elect to take to challenge the validity of such requirement pursuant to the applicable laws and if legally compelled to disclose any Information, then the Recipient will furnish only that portion of Information that is legally required.

**4. RESERVATION OF RIGHTS AND ACKNOWLEDGEMENT**

4.1 All Information is the property of the Discloser. Save as stated in this Agreement, no rights in respect of a Party's Information are granted to the other Party and no obligations are imposed on the Discloser.

4.2 Each Recipient agrees that:

(a) Information made available by the Discloser before or during negotiations in relation to the Purpose will form the basis of this Agreement;

(b) no express or implied representation or warranty is or will be made (and no responsibility or liability is or will be accepted by the Discloser or any of its Connected Persons) as to the accuracy or completeness of any Information made available to the Recipient;

(c) the Discloser has no obligation to update, or to correct any inaccuracies which may become apparent in, its Information;

(d) (subject to Clause 6.1 below) the Recipient's obligations under this Agreement are continuing and shall survive the termination of any discussions, negotiations or this Agreement between the Parties regarding the Purpose; and

(e) the disclosure of Information by the Discloser shall not form any offer by, or representation or warranty on the part of, the Discloser to enter into any further agreement in relation to the Purpose, or the development or supply of any product or service to which the Information relates.

(f) it shall indemnify the Discloser from any and all liability, loss or damage (including legal costs) suffered as a result of claims, demands or judgements arising out of the failure of the Recipient and the Connected Persons to conform to the provisions of this Agreement.

**5. WARRANTY**

The Discloser warrants that it has the right to disclose its Information to the Recipient and to allow the Recipient to use such Information for the Purpose.

**6. TERM AND TERMINATION**

6.1 This Agreement shall commence on the Effective Date. All obligations under this Agreement shall continue until the later date of either (i) a period of two (2) years from the Effective Date; or (ii) up to the date on which Information which constitutes the Discloser's trade secrets loses its character of confidentiality.

6.2 Termination of this Agreement shall not affect any accrued rights or remedies to which either Party is entitled at the date of termination.

6.3 The Recipient shall:

(a) destroy or (at the Discloser's request) return to the Discloser all documents and materials (and any copies) containing, reflecting, incorporating, or based on the Discloser's Information;

(b) erase the Discloser's Information from its computer systems or which is stored in electronic form,

provided that a Recipient and/ or its Connected Persons may retain documents and materials containing, reflecting, incorporating, or based on the Discloser's Information to the extent required by law, any applicable governmental or regulatory authority, any insurance policy, or any written internal policy of the Recipient. The provisions of this Agreement shall continue to apply to any such documents and materials retained by the Recipient.

**7. NO INTENTION TO CREATE LEGAL RELATIONS**

**7.1 This Agreement:**

(a) is not intended to, and does not operate to, create a partnership or other form of commercial relationship between the Parties. Neither Party shall publicly or privately state any form of relationship with each other unless the other Party expressly authorises such statement to be made;

(b) does not grant authority or license for one Party to exploit or utilise the intellectual property of the other, nor to use the Information for any purpose other than for the Purpose of this Agreement.

(c) does not obligate either Party to enter into any commercial arrangement with the other.

**8. OTHER APPLICABLE TERMS**

8.1 No variation of this Agreement shall be effective unless it is in writing and signed by each of the Parties.

8.2 Failure to exercise, or any delay in exercising, any right or remedy provided under this Agreement or by law is not a waiver of that or any other right or remedy, nor shall it preclude or restrict any further exercise of that or any other right or remedy.

8.3 Any provision of this Agreement shall be severable if it is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, but all remaining provisions shall remain enforceable to the fullest extent permitted by law.

8.4 Save as stated otherwise in this Agreement, no Party may assign, sub-contract or deal in any way with, any of its rights or obligations under this Agreement or any document referred to in it except with prior written consent from the other Party.

8.5 This Agreement constitutes the entire agreement between the Parties and supersedes all previous drafts, agreements, arrangements and understandings between them, whether written or oral, relating to the Information.

8.6 This Agreement shall be governed by the laws of Dubai and the Federal Laws of the United Arab Emirates. Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be subject to the exclusive jurisdiction of the Courts of the Dubai International Financial Centre.

**Agreed by the Parties on the Effective Date.**

[redacted]

Signature [redacted]

Name

*Authorized Signatory*

**Counterparty**

Signature Marvin Cunanan
..........................................................

Name Marvin Cunanan

*Authorized Signatory*

[redacted]

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement ("Agreement") is entered into and effective as of ___**Byte Bridge Inc**_________ (the "Effective Date") by and between [redacted] and the undersigned counterparty ("Company").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Purpose**. Company and [redacted] wish to exchange information of a proprietary and confidential nature relating to our respective businesses in connection with a business relationship between the parties (the "Business Purpose").

2. **Definition**. "Confidential Information" means any information not subject to exclusion pursuant to *Section 3* disclosed in connection with the Business Purpose by one party (the "Disclosing Party") to the other party (the "Receiving Party"), whether tangible or intangible, including without limitation design details, selection and sequence of components and materials, manufacturing processes, research plans and results, pricing information, financial information, business or marketing plans, business or technical methodologies, strategies, technology, specifications, development plans, customers, prospective customers, partners, suppliers, billing records, and products or services, provided that: (a) the Disclosing Party has marked or identified such information as confidential or proprietary; (b) the Disclosing Party identified as confidential such information within 30 days of disclosure to the Receiving Party; or (c) a reasonable person would deem such information to be confidential or proprietary given the nature of the information and the circumstances under which it is disclosed.

3. **Exclusions.** Confidential Information shall not include any information that the Receiving Party can show: (a) was in its possession prior to disclosure by the Disclosing Party hereunder; (b) is or becomes generally known to the public other than through Receiving Party's failure to observe any or all terms and conditions hereof; (c) is received from a third party without breach of any obligation owed to Disclosing Party; and (d) any information that can be demonstrated to have been independently developed by the Receiving Party without use of or reliance on any of the Confidential Information.

Notwithstanding the above exceptions, technical information disclosed under this Agreement shall not be deemed to be within the foregoing exceptions merely because such information is embraced by more general information in the public domain or in the Receiving Party's possession, and any combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or in the Receiving Party's possession, but only if the combination itself and its principle of operation are in the public domain or in the Receiving Party's possession.

4. **Confidentiality and Use Restriction.** With respect to Confidential Information, the Receiving Party agrees as follows: (a) The Receiving Party shall not disclose any Confidential Information of the Disclosing Party except with the Disclosing Party's prior written permission; provided that the Receiving Party may disclose any Confidential Information of the Disclosing Party to its employees and consultants who have a need to know such Confidential Information for the Business Purpose, and who are subject to confidentiality duties or obligations to the Receiving Party that are no less restrictive than the terms and conditions of this Agreement. (b) The Receiving Party shall not embody any of the Confidential Information in any of its products, processes, or services, or duplicate or exploit any of the Confidential Information in its business, or otherwise use any of the Confidential Information for any purpose other than in connection with the Business Purpose. (c) The Receiving Party shall use at least reasonable care and adequate measures to protect

[redacted]

the security of the Confidential Information and to ensure that any Confidential Information is not disclosed or otherwise made available to other persons or used in violation of the foregoing. Such measures shall be at least the equivalent of measures which the Receiving Party uses to protect its own most valuable proprietary information.

5. **Required Disclosures.** If Receiving Party is compelled by law to disclose Confidential Information of the Disclosing Party, it shall provide the Disclosing Party with prior written notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at Disclosing Party's expense, if the Disclosing Party wishes to contest the disclosure.

6. **Export Controls.** Confidential Information disclosed by the parties under this Agreement may be subject to export controls under the laws of the United States. Each party will comply with such laws and agrees not to knowingly export, re-export or transfer Confidential Information of the other party without first obtaining all required United States authorizations or licenses.

7. **Term and Termination.** This Agreement is intended to cover Confidential Information disclosed after the Effective Date and to Confidential Information disclosed earlier to the extent that the parties began discussions concerning the Business Purpose prior to the Effective Date. This Agreement will expire three (3) years from the Effective Date unless either party earlier terminates this Agreement upon 30 days written notice; however, any termination or expiration of this Agreement shall not relieve the Receiving Party from its confidentiality and use obligations with respect to Confidential Information disclosed prior to the date of termination. For trade secrets of the Disclosing Party, the survival period shall last for as long as such Confidential Information qualifies as a trade secret under applicable federal, state and/or local law. All modifications to and waivers of any terms of this Agreement must be in a writing that is signed by the parties hereto and expressly references this Agreement.

8. **Assignment.** Neither party will assign, transfer or delegate its rights or obligations under this Agreement (in whole or in part) without the other party's prior written consent except that either party may assign and delegate this Agreement pursuant to a transfer of all or substantially all of its business and assets, whether by merger, sale of assets, sale of stock, or otherwise. Any attempted assignment, transfer or delegation in violation of the foregoing shall be null and void.

9. **No License; Inventions.** The Confidential Information will remain the sole property of the Disclosing Party. Neither this Agreement nor any disclosure of information hereunder grants the Receiving Party any rights, title, or license under any trademark, copyright, or patent now or hereafter owned or controlled by the Disclosing Party. This Agreement is not intended to confer any right or license with respect to the Confidential Information. This Agreement shall not reduce, limit, or supersede any intellectual property, trade secret, or other rights or remedies of either party available under applicable law.

10. **Return of Materials; Survival of Obligations.** At the termination or expiration of this Agreement, the Receiving Party agrees to return to the Disclosing Party or destroy (with proof of destruction) all copies of writings and other materials in its possession or control that contain Confidential Information received from the Disclosing Party under this Agreement. The Receiving Party's obligations under Sections 4 and 11 shall survive the return or destruction of such materials and any expiration or termination of this Agreement.

11. **Notice of Independent Knowledge or Breach.** The Receiving Party agrees to notify the Disclosing Party promptly in writing if: (a) upon disclosure of Confidential Information by the Disclosing Party, the Receiving Party has prior knowledge of the same; (b) subsequent to disclosure of any Confidential Information, information is disclosed to the Receiving Party in the manner described in Section 3(c); or (c) the Receiving Party becomes aware of any breach of confidentiality with respect to the Confidential Information in its possession. Notice by email is sufficient where receipt is confirmed.

12. **No Other Obligation.** This Agreement imposes no obligations on either party to exchange any Confidential

[redacted]

Information or to purchase, sell, license, transfer or otherwise transact in any technology, services or products. Nor does this Agreement create any agency or partnership relationship between the parties hereto.

NO WARRANTY IS MADE BY EITHER PARTY UNDER THIS AGREEMENT. ANY INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS."

**13. Remedies.** The Receiving Party agrees that any violation of this Agreement by it may cause irreparable injury to the Disclosing Party which would not be adequately compensated by money damages. Accordingly, the Disclosing Party shall be entitled to seek an injunction or other appropriate equitable relief to restrain any breach or threatened breach of this Agreement without the requirement to post bond.

**14. Notices.** All notices under this Agreement shall be in writing and shall be delivered to the addresses set forth herein. Notice shall be deemed to have been given upon: (i) personal delivery; (ii) the second business day after mailing; (iii) 48 hours after sending by confirmed facsimile; or (iv) 48 hours after sending by email. Notices to [redacted] shall be sent to the attention of its General Counsel via email to legal@[redacted]com and by mail to [redacted] Notice to the Company shall be sent to the address provided in the signature block. Either party may change its address for notice by giving notice of such address change in the manner provided herein.

**15. Enforcement and Entire Agreement.** This Agreement shall be governed by the laws of the State of California, without regard to California's conflict of laws rules. In the event that any provision of this Agreement conflicts with governing law or if any provision is held to be null, void or otherwise ineffective or invalid by a court of competent jurisdiction, (a) such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law, and (b) the remaining terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party. This Agreement and all expressly referenced documents constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or communications, including any reseller or similar agreements previously executed by the parties.

This Agreement may be executed in two or more counterparts, through electronic, wet-ink, or other acceptable signature format which together shall constitute a single agreement treated in all respects as an original document.

**Accepted and Agreed to:**

Company: ______Byte Bridge Inc.________________

By: Marvin Cunanan

Name: ____Marvin Cunanan______________________

Title: ____VP Of Sales______________________

[redacted]

[redacted]

Date:_____9/17/2024________________________ Date: 9/17/2024__________________________

Address for Notices:

___1502 Crocker Ave, CA 94544_______________

___________________________________

___________________________________

Email:_______marvin@bytebt.com________________________

_

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

**MASTER SALES AGREEMENT**

This **MASTER SALES AGREEMENT** (the "MSA" or the "Agreement") is made and entered into effective as of Sep 30, 2024 by and between Byte Bridge Inc with its principal place of business 1502 Crocker Avenue, Hayward, CA 94544 ("Supplier"), and [redacted] Inc. a Delaware Corporation, with office located at 2510 Zanker Road, San Jose, CA 95131. **("Customer")**,

Customer and Supplier are also referred to as "party" and collectively as the "parties".

The parties have caused this Agreement to be duly executed. Each party warrants and represents that its respective signatories, whose signatures appear below, are on the date of signature authorized to execute this Agreement.

**PREAMBLE**

A. Supplier and its Affiliates (defined below) are engaged in the business of [redacted]
B. Supplier desires to Supply [redacted] to Customer under the following terms and conditions.

Now, therefore, for good and valuable conside/ration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to the terms and conditions set forth in this Agreement.

1. **DEFINITIONS**

1. "Affiliate" means an entity directly or indirectly controlling, controlled by or under common control with a party, where control means the ownership or control, directly or indirectly, of more than 50 percent of all of the voting shares; provided that an entity shall be considered an affiliate only for the time during which such control exists.

2. "Applicable Law" means any applicable law, including without limitation statutes, regulations, treaties, and other official pronouncements of any relevant governmental entity.

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

3. “Intellectual Property Rights” means any and all tangible and intangible: (i) copyrights and other rights associated with works of authorship throughout the world, including but not limited to copyrights, neighboring rights, moral rights, and mask works, and all derivative works thereof; (ii) trademark and trade name rights and similar rights; (iii) trade secret rights; (iv) patents, designs, algorithms, utility models, and other industrial property rights, and all improvements thereto; (v) all other intellectual and industrial property rights (of every kind and nature throughout the world and however designated) whether arising by operation of law, contract, license, or otherwise; and (vi) all registrations, applications, renewals, extensions, continuations, divisions, or reissues thereof now or hereafter in force (including any rights in any of the foregoing).

4. “Purchase Order”(“**PO**” or “**Order**”) means any purchase order or amendment to a purchase order submitted by the Customer to Supplier under this Agreement. (the template is attached);

5. “Price” means the price of the Parts identified in the applicable Purchase Order;

2. **TERM AND TERMINATION**

1. **Term of MSA:** The term of this Agreement begins on the Effective Date and will continue unless earlier terminated as described herein, for a period of 1 Year. (the “Initial Term”). This Agreement shall be automatically renewed for an additional one-year term unless 30 days prior notice is provided to the other party of its election not to renew this Agreement.If there is any unfinished PO when the Agreement expires, the term of this Agreement will be postponed to the completion of such PO.

2. **Termination for Convenience:** Either party may terminate this Agreement, or both at any time, for no reason or for any reason, upon 30 days written notice to the other. Termination of this MSA for convenience will not terminate any unfinished PO. In such case, this MSA, that provides for a specific term will remain in effect for the remainder of such term.

3. Upon termination of this MSA, all rights and obligations of the parties under this MSA

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

will automatically terminate except for rights of action accruing prior to termination, payment obligations, confidentiality obligations, intellectual property obligations, the liability for breach of Agreement and/or PO, any obligations that expressly or by implication are intended to survive termination and any obligations as they relate to an existing Service Agreement.

4. **Termination for a cause by Either Party:** Either Party may terminate this Agreement and/or PO immediately, upon written notice: (i) if the other Party breaches the NDA; (ii) Unless otherwise agreed in this Agreement, if the other Party breaches any provision of this Agreement and fails to cure such breach within thirty (30) days after receipt by the breaching Party of written notice from the non-breaching Party describing such breach; (iii) upon the institution by or against the other Party of insolvency, receivership, or bankruptcy proceedings or any other proceedings for the settlement of the other Party's debts, which proceedings are not stayed or dismissed within sixty (60) days after institution; (iv) upon the other Party's making an assignment for the benefit of creditors; or (v) upon the other Party's dissolution or ceasing to conduct business.

3. **TERMS OF PURCHASE, RECEPTION, INSPECTION AND ACCEPTANCE**

1. **Requests for Product; Quotes and Orders:** All orders for Products must specify Supplier quotation (if any) and the Products requested (specification/model, quantity, unit price and total price) and invoice address, the delivery time and the delivery place .

2. All orders are subject to acceptance by Customer, unless otherwise agreed in the PO, each deliverable will be considered accepted ("Acceptance" ) when Customer provides Supplier a written notice of acceptance within ten (10) days after the delivering of the Products and/or Service under the PO. In case that the Products or Service fail to meet requirements agreed in the Agreement and the PO, Customer has the right to require Supplier to replace, complement or adopt other remedial measures within the period regulated by Customer, if Supplier fails to replace, complement or adopt other remedial measures within the period regulated by Customer, the Customer shall be entitled to terminate the PO and refuse to make the payment against the disputed PO, if the price has been paid, the Supplier shall refund

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

the price within 10 days upon receiving Customer's written request, and the Supplier shall pay all the losses suffered by Customer. Notwithstanding the foregoing, due to the delay in delivery, Supplier shall bear the liability agreed in Clause 3.3. Customer's acceptance does not mean that Customer confirms the products or service are in compliance with laws, regulations and the requirements agreed in the Agreement.

This MSA does not mean that Customer promises to submit any order under this MSA.

3. In case of failure in deliver the products or service within the period agreed in the PO (including the products or service are not qualified or the delivery is overdue), [redacted]

4. **Prices:** The prices charged for Products purchased under this MSA will be Supplier's [redacted] All prices are inclusive of all applicable taxes. Unless otherwise agreed in this Agreement or in the PO, the prices stipulated in PO cover all the fees that Customer need to pay under the PO, including but not limited to the [redacted] Customer does not need to pay Supplier or any other fees under the PO.

5. **Invoicing and Payment:** Unless otherwise agreed in the PO, Customer's payment terms will be net thirty (30) days from the date of receiving the qualified invoice, the invoice shall be issued by Supplier after the effective date of the PO and the acceptance under the PO, otherwise, the Customer has the right to postpone the payment terms. Customer will pay Supplier in US dollars, as invoiced by Supplier. For invoices not paid on time and the prices are still unpaid within 10 (ten) days upon Supplier's written notice, Supplier reserves the right to charge Customer interest at a rate of [redacted] applied against undisputed overdue amounts.

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

Below is Supplier's Bank Account Information:
Account Name: Byte Bridge Inc
Account Number: [redacted] (Checking Account)
Bank Name: [redacted]
Routing Number: [redacted]

6. **Purchase by Affiliates:** Unless otherwise agreed in writing, any Affiliate of the Customer who submits an order to Supplier for Products shall agree to abide by the terms of this MSA.

**4. THIRD PARTY PRODUCTS AND WARRANTIES**

1. **Third Party Products:** "Third Party Products" means any third-party hardware, services or software licensed, purchased and/or used by Customer._Except as agreed to in writing between Customer and Supplier, Third Party Products shall be exclusively subject to terms and conditions between the third party, Supplier and Customer, the Third Party shall in accordance with Good Industry Practice and the agreed in the Agreement or PO. Supplier shall be jointly and severally liable if the products or services provided by the Third Party do not meet the needs of Client or as agreed herein.

2. **Supplier hereby warrants that:**

1. Supplier is an entity validly existing and in good standing under the laws of the jurisdiction in which it is organized, and the Supplier has the full right, power, legal capacity, and authority to enter into the Agreement and to carry out the terms and conditions hereof and thereof;
2. Any products (including the third party products) or service that Supplier provided to Customer shall comply with the requirements of any laws and regulations, any applicable standards (including but not limited to national standards, industry standards, product manuals, any standards agreed upon by both parties, etc.), Any products (including the third party products) or service shall be brand-new and has never been used;
3. Completing the obligations in a proficient and professional manner and all the service

completely shall meet the requirements agreed in the Agreement, PO and commercial purpose;

4. Any products or service that Supplier provided to Customer does not contain viruses, time or logic bombs, Trojan horses, worms, timers, clocks, trap doors, or other techniques that erase data or programming, infect, disrupt, damage, disable, or shut down the product or any component, including, without limitation, its security or user data, or otherwise cause the product or service to become inoperable of being used.
5. the Supplier shall use commercially reasonable efforts to provide the following support ("Support"):(1) provide Customer with Updates to the products; (2) technical support to correct the problem of the products or service within [24 hours] upon receiving the notice of Supplier or within the period agreed in the PO, whichever is earlier. Otherwise, the Customer shall be entitled to: (a) correct the problem by itself or by third party entrusted by the Customer, the expenses incurred thereby shall be borne by Supplier; and/or (b) demand to reduce the price.
6. Despite other agreement, if Supplier violates the above obligations, Customer shall be entitled to terminate the Agreement or any PO under this Agreement, and the Customer has the right to request Supplier to compensate all the losses suffered by Customer and its Affiliates and pay Customer the penalty which is equal to 10% of the total Prices under this Agreement.

5. **CONFIDENTIALITY AND INTELLECTUAL PROPERTY**

**5.1**In the performance of the Agreement, Customer and Supplier may have access to or be exposed to information of the other party not generally known to the public, including, but not limited to software, product plans, customer lists, "know-how," or trade secrets which may be designated as being confidential or which, under the circumstances surrounding disclosure, ought to be treated as confidential (collectively, "Confidential Information"). Confidential Information may not be shared with third parties unless such disclosure is to personnel of Supplier or Customer, including employees, agents, and subcontractors, on a "need-to-know" basis in connection with its performance of this MSA, so long as such personnel have agreed to treat such Confidential Information under terms at least as restrictive as those herein. Each party agrees to take the necessary precautions to maintain the confidentiality of Confidential Information by using at least the same degree of care as such party employs with respect to its own Confidential Information of a like-kind nature, but in no case less than a commercially reasonable standard of care to maintain confidentiality and shall only make such information

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

available to its employees on a "need-to-know" basis. The foregoing shall not include information, which, was known by one party prior to its receipt from the other or is or becomes public knowledge without the fault of the recipient, is received by the recipient from a source other than a party to this MSA, or a party is required to disclose in response to an order by a court or governmental agency, provided that advance notice of the disclosure is provided to other party.

5.2 Supplier hereby warrants that any products or service provided to the Customer shall not infringe others' intellectual property or other rights and not violate relevant laws and regulations. Otherwise, Supplier shall give a written notice to the Customer immediately and actively deal with the infringement matters, eliminating the negative impact on Customer and its Affiliate. All the liabilities and costs arising therefrom shall be borne by Supplier, whereas Customer and its affiliated companies are exempt from any liability or costs.

5.3 All intellectual properties, data in connection with Customer's business, and all works and materials created for the performance of this MSA or any PO shall remain the property of Customer, neither Supplier nor any Third Party shall make any use of them or infringe the rights of Customer.

5.4 In order to avoid disputes, despite any other agreement, if either party violates the obligation of confidentiality, [redacted] If liquidated damages aforesaid are not sufficient to cover all the losses borne by the suffering party, the default party shall make up for it.

## 6. GOVERNING LAW

This Agreement shall be governed in all respects solely and exclusively by the laws of the State of California, U.S.A. without regard to conflict of laws principles. The parties hereto expressly consent, and submit themselves, to the exclusive jurisdiction of the courts of California, and it is stipulated that venue shall be in California for the adjudication or disposition of any claim, action or dispute arising out of this Agreement.

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

bytebridge

7. **VIOLATION LIABILITIES**

**7.1** Unless otherwise agreed in this Agreement, either Party that fails to perform its obligations in this Agreement in time/in full or violates this Agreement shall be deemed to be in breach of Agreement, the Defaulting Party shall make up for the loss. The losses including but not limited to the liability, direct and indirect losses assumed by the non-defaulting party, the investigation cost, notarial fee, counsel fee, litigation or arbitration fee, transportation and communication costs, etc.

7.2 If Customer terminates the Agreement or PO due to Supplier's breach of Agreement, Customer does not need to the related price, if the price has been paid, Supplier shall return the price having been paid by Customer.

8. **FORCE MAJEURE**

Neither party shall be liable to the other for delays or failures in performance resulting from causes beyond the reasonable control of that party, including, but not limited to, acts of God, disturbances, material shortages or rationing, riots, acts of war, governmental regulations, communication or utility failures, or casualties.

9. **SEVERABILITY**

If any court of competent jurisdiction holds that any provision of this Agreement is illegal, invalid, or unenforceable, the legality, validity, and enforceability of the remaining provisions of this Agreement will not be affected or impaired, and all remaining terms of this Agreement remain in full force and effect, provided that this provision shall not be applied to defeat the intent of the parties.

10. **WAIVER**

A party’s decision not to insist on strict performance of any requirement of this Agreement shall not operate or be construed to waive any future omission or breach, or any other provision of this Agreement.

11. **NOTICE.**

Unless otherwise agreed in the PO, Any notice of other communications made or given by either party in connection with this Agreement shall be sent via the following contact

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

information. If any party needs to change the following information, it should notify the other party in advance, otherwise the party making the change shall bear all the consequences caused by the failure of notification in time.

| | |
|---|---|
| Customer: [redacted] Inc.<br>Contact Address: [redacted]<br>Contacts: Legal Department<br>Phone Number:<br>Email Address: legal@[redacted]com | Supplier: Byte Bridge Inc<br>Contact Address: 1502 Crocker Ave. Hayward, CA 94544<br>Contacts: Marvin Cunanan<br>Phone Number:<br>Email Address: marvin@bytebt.com |

12. **COUNTERPARTS**

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

13. **ENTIRE AGREEMENT**

This Agreement is the complete agreement between the parties regarding the subject matter hereof and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.

14. **MISCELLANEOUS**

14.1 This Agreement and the Purchase Order shall constitute the full and complete agreement regarding relevant matters. The Purchase Order as an indispensable part of this Agreement. In the event of any inconsistency between the Agreement and the Purchase Order, the Purchase Order shall prevail.

14.2 For any matter unmentioned herein, both parties can make resolution by signing a written supplementary agreement upon reaching consensus through negotiation.

14.3 Both parties agree that this Agreement can be concluded in the form of data message digitally transferred through the internet or in paper form.

1)If this Agreement is concluded in the form of data messages, both parties agree to be legally bound by its force. Both parties shall abide by the relevant national laws and regulations, the

Byte Bridge Inc
1502 Crocker Ave, Hayward CA 94544

relevant regulations and standards of the national information security level protection, the Internet technical specifications and security specifications designated by the state. Both parties agree to sign the electronic version of this Agreement by means of electronic signature confirmation, and shall not refuse to perform the obligations within this Agreement on this ground.
2)If this Agreement is concluded in paper form, it shall come into force after being sealed by both parties. And this Agreement is in duplicate with each party holding one copy, which has the same legal force.

14.4 The title of this Agreement and terms is only for convenience of reading without any influence on interpretation.

14.5 In case there is any discrepancy in the contents between the English and the Chinese versions, the English version shall prevail.

**IN WITNESS WHEREOF, the parties have executed this Agreement on the date set forth above**.

**SIGNED,STAMPED AND DELIVERED BY,**

**[redacted] Inc.**

**Signature:**

[redacted]

**Date:** 10/1/2024

**SIGNED, STAMPED AND DELIVERED BY,**

**ByteBridge inc.**

**Signature:**

DocuSigned by:
Marvin Cunanan
738AB714964E4E0...

**Name:** Marvin Cunanan
**Title:** GM, North America
**Date:** 9/30/2024